**SIGHTSOUND.COM INCORPORATED,**
Plaintiff,

v.

**N2K, INC., CDNow, Inc., and CDNow Online, Inc., Defendant.**

No. Civ.A. 98–CV–118.

United States District Court,
W.D. Pennsylvania.

Oct. 24, 2003.

Meyer Unkovic & Scott, Attn Richard F Rinaldo, Pittsburgh PA, Kenyon & Kenyon, Attn John Flock, New York NY, Kenyon & Kenyon, Attn William Wells, Washington DC, for Plaintiff's Counsel.

Edward C Flynn, Pittsburgh PA, Parcher Hayes & Snyder, Attn Steven M Hayes,

New York NY, Alston & Bird, Attn John Barnhardt III, Charlotte NC, for Defendant's Counsel.

### OPINION and ORDER OF COURT

AMBROSE, Chief Judge.

Pending before the Court is a Motion by Defendants N2K, Inc. ("N2K"), CDNow, Inc., and CDNowOnline, Inc. (collectively, "CDNow"), seeking summary judgment in this patent infringement case on the grounds that the patents-in-suit are invalid and that the method utilized by Plaintiff in calculating its damages is invalid as a matter of law. Also pending is a Motion by Plaintiff Sightsound.com, Incorporated ("Sightsound"), seeking summary judgment with regard to the affirmative defense and counterclaims of inequitable conduct offered by Defendants. For the reasons discussed below, Defendants' Motion is denied and Plaintiff's Motion is granted.

### I. INTRODUCTION

#### A. Factual Background [1]

Plaintiff describes the "Eureka!" moment of inventor Arthur Hair as having occurred more than fifteen years ago when he was first shown a "digital audio compact disc." (Plaintiff's Brief in Opposition to the Motion for Summary Judgment, "Plf.'s Brief in Opp.," Docket No. 174, at 1.) Mr. Hair claims not to have been overly impressed by this device because he realized music was still being distributed on a physical medium even though it had been recorded in the same digital form that computers used to store and communicate information. Mr. Hair determined to eliminate the physical medium altogether and devise a method by which consumers could purchase and download music to their personal computers over telecommunications lines. (Id.)

Several years later, on March 2, 1993, the United States Patent and Trademark Office ("PTO") issued United States Patent No. 5,191,573 ("the '573 Patent") to Mr. Hair who later assigned all his rights, title and interest in the '573 Patent to a company he co-founded, known as Parsec Sight/Sound, Inc. ("Parsec.") He also assigned to Parsec two other patents, No. 5,675,734, issued on October 7, 1997 ("the '734 Patent"), and No. 5,966,440, issued on October 12, 1999 ("the '440 Patent"). The '734 and '440 Patents are claimed to be continuations of '573 Patent. (Amended Complaint, Docket No. 39, "Am. Compl.," ¶¶ 14 and 17.) All three patents ("the Sightsound Patents") relate to a method of selling digital audio and/or video signals from a host computer to a remotely located personal computer via telecommunications lines.

In 1995, Parsec became the first entity to sell a digital audio song for download over the internet, using the system developed by Mr. Hair, and in April 1999, sold its first digital movie via the Internet, again using Mr. Hair's patented technology. (Plf.'s Brief in Opp. at 2.) On April 1, 1999, Parsec and a sister corporation, Digital Sight/Sound, Inc., were merged and the surviving corporation renamed Sightsound.com, Incorporated.

Plaintiff claims that in 1996, Defendant N2K began offering free downloads of digital audio music files. (Plf.'s Brief in Opp. at 2.) When Sightsound learned of this activity, it advised N2K of its patents and offered to provide download services for Defendant's customers. N2K rebuffed the offer and in July 1997 launched its own system, known as "www.MusicBoule-

---

**1.** Unless otherwise stated, the facts in this section are undisputed.

vard.com" for selling music in digital download form over the Internet.

On March 31, 1999, a merger occurred between N2K and Defendant CDNow, Inc. CDNow became the parent of a new corporation known as CDNowOnline and of N2K. Subsequently, all the assets of N2K, including those related to its digital audio download business, were transferred to either CDNow or CDNowOnline. CDNow shut down www.MusicBoulevard.com and initiated "www.CDNow.com," even though CDNow was aware that Sightsound had sued N2K.

### B. Procedural History

Sightsound filed suit against N2K in this Court on January 16, 1998, alleging that N2K had infringed its patent rights under the '573 and '734 Patents. While discovery was underway, the mergers discussed above took place and Plaintiff consequently filed an Amended Complaint on April 3, 2000, adding CDNow and CDNowOnline as additional defendants [2] and changing the name of the plaintiff to Sightsound.

Plaintiff's Amended Complaint alleges that by making, selling, and/or offering to sell (or inducing others to make, sell or offer to sell) digital audio signals for use with processes and/or systems within the scope of the Sightsound Patents, Defendants have infringed on its valid and enforceable patents without authority. (Am. Compl., ¶¶ 21–28.) Plaintiff further claims that N2K and its successors had notice of these patents pursuant to U.S.C. § 287 prior to Plaintiff filing suit, but willfully and deliberately continued their infringing activities until at least May 1999 through their download service, www.MusicBoulevard.com. (*Id.*, ¶¶ 25–28.)

Similarly, in Count II of the Amended Complaint, Sightsound claims that beginning in February 2000, Defendants made, sold, and/or offered to sell (or induced others to make, sell or offer to sell) digital audio signals for use with processes and/or systems within the scope of the three patents via their service, www.CDNow.com. (Am.Compl., ¶¶ 30–36.) As in Count I, Plaintiff claims that these actions are infringements carried out with notice and without authority.

As relief, Plaintiff seeks an injunction declaring that the patents-in-suit are valid and enforceable, that Defendants' actions have infringed the patents, and that further acts of infringement are prohibited. Further, because the infringements were wilful and deliberate, Plaintiff seeks not only compensatory damages but also treble damages pursuant to 35 U.S.C. § 284 and reasonable attorneys' fees pursuant to 35 U.S.C. § 285. (Am Compl., Prayer for Relief, ¶¶ H and I.)

In their Answer and Counterclaim, filed on April 27, 2000, Defendants CDNow and CDNowOnline alleged that the patents are invalid under 35 U.S.C. §§ 102, 103 and/or 112. (Docket No. 40, ¶¶ 37–39.) They also filed a counterclaim against Sightsound pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, seeking a declaratory judgment that neither Defendant infringed on the patents or induced infringement thereof.

On May 18, 2000, N2K filed its First Amended Answer, Affirmative Defenses and Counterclaims (Docket No. 45), in which it also claimed that the three Patents were invalid. N2K also offered as an affirmative defense the claim that Sightsound had failed to disclose to the PTO the fact that research into the prior art carried

---

**2.** In July 2000, CDNow was acquired by Bertelsmann, Inc., which subsequently shutdown www.CDNow.com in favor of its own on-line service. (Plf.'s Brief in Opp. at 3.) Bertelsmann is not a defendant in this case.

out during prosecution of the '573 and '734 Patents had identified "numerous materials relevant and material to the patentability of the claimed inventions." N2K claimed that the '573 and '734 Patents were unenforceable as a result of Plaintiff's inequitable conduct in failing to disclose this information. (*Id.*, ¶¶ 40–43.)

Discovery was stayed for some twenty months while the parties attempted to settle their dispute. In February 2001, they filed their pleadings directed to the claim construction phase of the litigation. As part of this phase, a *Markman* hearing[3] was held on April 18–20, and May 16, 2001, before Magistrate Judge Kenneth Benson who had been assigned the case by Judge Donald Lee.

Meanwhile, on March 1, 2001, Defendants CDNow and CDNowOnline filed a Motion for Leave for File an Amended Answer and Counterclaim (Docket No. 77), arguing that during discovery, they had come to believe that Mr. Hair had provided false or misleading information to the PTO during prosecution of the '440 Patent application. They sought leave to amend their Answer to include an affirmative defense of inequitable conduct and a counterclaim for a declaratory judgment of patent unenforceability based on that conduct. (*Id.* at 5; *see also* Declaration of Michael Barclay, Docket No. 78, Exhibit 1, Defendants CDNow and CDNowOnline's Amended Answer and Amended Counterclaims, "CDNow's Am. Ans.") Defendant N2K similarly amended its answer and counterclaim, seeking to extend the inequitable conduct defense it had previously stated its earlier Amended Answer to cover Mr. Hair's actions regarding prosecution of the '440 Patent as well. (*See* Docket No. 80, Exhibit A, Second Amended Answer, Affirmative Defenses and Counterclaims of N2K, Inc., "N2K's Sec. Am. Ans.")

Judge Benson entered his Report and Recommendation on the claims construction phase on February 8, 2002. ("Magistrate's Report," Docket No. 105,[4] and amendment thereto at Docket No. 113.) Upon Judge Benson's resignation from the bench on August 16, 2002, and Judge Lee's recusal on October 18, 2002, the case was reassigned to me. On November 11, 2002, following a status conference, I issued a Memorandum Order of Court, adopting Judge Benson's Report and Recommendations as amended. (Docket No. 130.) At the same time, over objections by Plaintiff, I granted the Motions to Amend by CDNow and by N2K, setting out the inequitable conduct allegations. (Docket Nos. 131 and 132.)

On December 9, 2002, Plaintiff advised Defendants that the only claims remaining at issue are Claims 1, 2, 14, and 26 of the '734 Patent (against all Defendants) and Claims 6, 8, 11, and 12 of the '440 Patent (against CDNow and CDNowOnline) (these claims will be referred to collectively as the "Asserted Claims.") (Defendants' Exhibits to the Declaration of Steven M. Hayes in Support of Defendants' Motion for Summary Judgment, "Hayes Decl. Exhs.," Docket No. 162, at Exh. 14.) According to Plaintiff, these

---

**3.** *See Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). A *Markman* hearing may be held to assist the court in resolving disputes surrounding claim interpretation both for purposes of infringement and invalidity, particularly when those claims involve interpretation of complex technical information. *Safe–Strap Co. v. Koala Corp.,* 270 F.Supp.2d 407 (S.D.N.Y.2003); *Gallant v. Telebrands Corp.,* 35 F.Supp.2d 378, 402–03 (D.N.J.1998).

**4.** Published at *SightSound.Com Inc. v. N2K, Inc.,* 185 F.Supp.2d 445 (W.D.Pa.2002).

Claims represent two embodiments of the Hair invention.

On April 24, 2003, Sightsound filed a Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56, seeking to dismiss with prejudice all of the inequitable conduct affirmative defenses and counterclaims relating to inequitable conduct. (Docket No. 156, "Plf.'s Motion.") On the same day, Defendants also filed for summary judgment, arguing that the Asserted Claims are invalid under 35 U.S.C. §§ 102, 103, and/or 112 and that the calculation used by Sightsound in establishing its damages is invalid as a matter of law. (Docket No. 159, "Defs.' Motion.")

## C. *Jurisdiction and Venue*

Jurisdiction is appropriate in this court pursuant to 28 U.S.C. § 1338(a), giving district courts original jurisdiction over civil actions arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks. Venue is proper here under 28 U.S.C. § 1400(b) which permits a civil action for patent infringement to be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business.[5]

## II. *STANDARD FOR SUMMARY JUDGMENT*

A court may grant summary judgment if the party so moving can show, based on "pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, . . . that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.

R.Civ.P. 56(c); *Rossetti v. Busch Entertainment Corp.*, 87 F.Supp.2d 415 (E.D.Pa. 2000). If a reasonable jury could return a verdict for the non-movant, the dispute is genuine and if, under substantive law, the dispute would affect the outcome of the suit, it is material. A factual dispute between the parties that is both genuine and material will defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In considering a motion for summary judgment, the court must view all the evidence in the light most favorable to the non-movant, accept the non-movant's version of the facts as true, and resolve any conflicts in its favor. *Rossetti, id., citing Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) and *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992). In short, the defendants must show that if the pleadings, depositions and other evidentiary material submitted to date were admissible at trial, the plaintiff could not carry its burden of proof based on that evidence and a reasonable jury would thus decide all genuine material disputes in the defendants' favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 318, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has demonstrated that there are no genuine issues of material fact, the burden shifts to the non-moving party to "make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by depositions and admissions on file." *Celotex, id.* at 322–23, 106 S.Ct. 2548; *Rosetti, id.;* Fed.R.Civ.P. 56(e).

---

**5.** Defendant N2K is a Delaware corporation; Defendants CDNow and CDNowOnline are Pennsylvania corporations. All Defendants have a regular place of business in Fort Washington, Pennsylvania, and thus for purposes of this litigation are residents of this judicial district.

The sum of the affirmative evidence to be presented by the non-moving party must be such that a reasonable jury could find in its favor, and it cannot simply reiterate unsupported assertions, conclusory allegations or mere suspicious beliefs. *Liberty Lobby, id.* at 250–252, 106 S.Ct. 2505; *Groman v. Township of Manalapan*, 47 F.3d 628, 633 (3d Cir.1995).

■ In the area of patent law, summary judgment may be granted only if the moving party can overcome by clear and convincing evidence the legal presumption that a duly-issued United States patent is valid. *Eli Lilly & Co. v. Barr Labs.*, 251 F.3d 955, 962 (Fed.Cir.2001), *citing* 35 U.S.C. § 282. Validity of a patent is a question of law which a court may decide at the summary judgment stage. *Eli Lilly, id.* A district court properly may grant summary judgment on questions of invalidity due to lack of enablement, obviousness, or anticipation "only when the underlying factual inquiries present no lingering genuine issues." *Beckson Marine, Inc. v. NFM, Inc.*, 292 F.3d 718, 723 (Fed.Cir. 2002).

■ As to the standard of review at summary judgment for the counterclaims and affirmative defense of inequitable conduct, such claims require the defendant to provide "evidence of affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1366 (Fed.Cir.2001) (internal quotation omitted). Both intent and materiality are questions of fact that must be proven by clear and convincing evidence. *Id.* Thus, inasmuch as Defendants

here will have the burden of proof at trial, they must now come forward with proof that would permit a reasonable trier of fact to find in their favor under a clear and convincing evidence standard. *See Liberty Lobby*, 477 U.S. at 254, 106 S.Ct. 2505, holding that when a heightened proof standard, e.g., clear and convincing evidence, will apply at trial, that standard also applies at summary judgment stage.

## III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment on the grounds that the '734 Patent and the '440 Patent are invalid as a matter of law. (Defs.' Motion at 1.) Specifically, Defendants argue that the copy protection claims lack the enablement required by 35 U.S.C. § 112; alternatively, to the extent those claims are enabled, they and the other Asserted Claims are anticipated by prior art under 35 U.S.C. § 102 and/or are rendered obvious by prior art under 35 U.S.C. § 103. *(Id.)* [6]

■ As a threshold matter, I note that both parties rely heavily on the testimony of experts to support their positions. Where there is "specific, plausible and detailed testimony by dueling expert witnesses," summary judgment is often inappropriate. *See e.g., Total Containment, Inc. v. Environ Prods.*, 99–1059, 99–1060, 1999 WL 717946, *4, 1999 U.S.App. LEXIS 22072, *11 (Fed.Cir. Sept. 15, 1999), vacating and remanding district court's grant of summary judgment on the question of anticipation; *St. Clair Intellectual Prop. Consultants v. Sony Corp.*, CA 01–557–JJF, 2003 U.S. Dist. LEXIS 3543, *1–*2 (D.Del. Feb. 21, 2003), concluding that

6. Defendants also assert that the Sightsound Patents are invalid because of Plaintiff's inequitable conduct in prosecution of the application from which the '440 Patent issued. (Defs.' Brief at 2.) However, they are not seeking summary judgment on the inequitable conduct counterclaim. *(Id.* at 2, n. 2.)

there were genuine issues of material fact regarding enablement, anticipation and obviousness where the issue of validity was reduced to conflicting expert testimony; and *Real v. Bunn–O–Matic Corp.*, 119 F.Supp.2d 807, 811 (N.D.Ill.2000), denying summary judgment where conflicting expert opinion on the question of enablement presented an issue for the trier of fact. I have read the declarations, reports and deposition testimony of the experts and find that their opinions are plausible and certainly detailed. In considering the questions raised by Defendants, therefore, I have kept in mind the effect such conflicting expert testimony has against granting summary judgment.

### A. Are the Copy Protection Claims Invalid for Lack of Enablement?

Claims 1 and 2 of the '734 Patent and Claims 6 and 8 of the '440 Patent relate to copy protection features believed to be commercially desirable for preventing unauthorized copying of downloaded files. (Plf.'s Brief in Opp. at 3.) Defendants argue that these "Copy Protection Claims" are invalid because they fail to comply with the disclosure requirements of 35 U.S.C. § 112. (Defendants' Brief in Support of Motion for Summary Judgment, Docket No. 160, "Defs.' Brief," at 14.) Each of the Sightsound Patents provides for "electronically coding the desired digital video or digital audio signals ... into a configuration which would prevent unauthorized reproduction of the desired digital video or digital audio signals." Defendants argue that Plaintiff's patents are invalid because there is "absolutely no disclosure" regarding the copy protection feature of the Hair invention. *(Id.)*

### 1. Relevant Law:

■■■ The Patent Act creates a presumption of validity for an issued patent which

can only be overcome by clear and convincing evidence that the claimed invention fails to meet the requirements of patentability. *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1319 (Fed.Cir. 2003), *citing* 35 U.S.C. § 282. Section 112 establishes a *quid pro quo* by which the patentee provides the public with full disclosure of the invention in exchange for the right to exclude others from making, using or selling the invention as claimed. The first paragraph of Section 112 provides:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112.

■■■ Where the patentee has failed to disclose information sufficient to enable those skilled in the art to make and use the claimed invention, the patent may be declared invalid for lack of enablement. *Moba*, 325 F.3d at 1321. Whether the patent specification satisfies the requirements for enablement is a question of law based on an underlying factual determination. *Id.; see also Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1366 (Fed.Cir. 1997) ("patent protection is granted in return for an enabling disclosure of an invention, not for vague intimations of general ideas that may or may not be workable.... Tossing out the mere germ of an idea does not constitute enabling disclosure.")

■■■ In determining enablement, the court will consider what is disclosed in the patent specification together with "what would be known to one of ordinary skill in

the art[7] without undue experimentation." *Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.,* 166 F.3d 1190, 1196 (Fed.Cir.1999); *Genentech,* 108 F.3d at 1365. "That some experimentation is necessary does not preclude enablement; the amount of experimentation, however, must not be unduly extensive." *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.,* 750 F.2d 1569, 1576 (Fed.Cir.1984). On the other hand, a patent need not teach what is well known in the art. *Ajinomoto Co. v. Archer–Daniels–Midland Co.,* 228 F.3d 1338, 1345 (Fed.Cir.2000), *cert. denied,* 532 U.S. 1019, 121 S.Ct. 1957, 149 L.Ed.2d 753 (2001). Enablement is determined as of the date the patent application was first filed. *Ajinomoto, id.* at 1345. The parties here do not dispute that the '734 and '440 Patents are continuations of the '573 Patent and thus date back to its filing date, June 13, 1988.

### 2. The Basis for Defendants' Claims Regarding Enablement

The sections entitled "Background of the Invention" of the '734 and '440 Patents set out four objectives. The first three are to provide new and improved systems or methodologies to (1) electronically sell and distribute, (2) store and retrieve, and (3) manipulate (i.e., sort, cue, and select) digital audio music or digital video. (Hayes Decl. Exh. 2, the '734 Patent, describing a "System for Transmitting Desired Digital Video or Audio Signals," and Exh. 3, the '440 Patent, describing a "System and Method for Transmitting Desired Digital Video or Audio Signals.") In their argument that the patents are invalid for lack of enablement, Defendants focus on the fourth objective of each Patent, that is, "to offer a new and improved methodology/system which can prevent unauthorized electronic copying of quality Digital Audio Music." They argue that the specifications do not contain disclosures sufficient to enable the copy protection aspect of the Asserted Claims, that is, there is nothing in the disclosure that would teach one of ordinary skill in the art to devise a "new and improved" means to "prevent" unauthorized copying of the digital audio or video signals. (Defs.' Brief at 17–18.)

In non-technical terms,[8] Claim 1 of the '734 Patent provides a method for

---

7. I note as another general reason for denying summary judgment that the parties have expressed substantial disagreement on what would be known by one skilled in the art. In determining the "ordinary level of skill in the art," the court must consider such factors as: "1) the types of problems encountered in the art; 2) the prior art solutions to those problems; 3) the rapidity with which innovations are made; 4) the sophistication of the technology; and 5) the educational level of active workers in the field." *Ruiz v. A.B. Chance Co.,* 234 F.3d 654, 666–67 (Fed.Cir.2000). Plaintiff's expert proposes that in this case, a person with ordinary skill in the art would have a bachelor's degree in electrical engineering or computer science. (Tygar Rebuttal at 29–31.) Defendants' expert described the person as having "no particular level of formal education," who could be an "avid teenager" or a "long time professional computer programmer." (Declaration of Michael Ian Shamos in Support of Defendants' Motion for Summary Judgment, Docket No. 164, at 30–31, ¶ 98.) A second expert proffered by Defendants, Dr. James Moorer, believed that one "skilled in the art" for purposes of these patents would possess a degree in engineering or computers and have some experience or skill in digital audio or digital music as well. (Magistrate's Report at 22–23.) He also believed there was "no consensus in the skill level of the typical user in 1988." (Declaration by James A. Moorer in Support of Defendants' Motion for Summary Judgment, Docket No. 163, ¶ 19.) This dispute is material to any determination in which the knowledge of one with ordinary skill in the art is a factor.

8. These summaries of the Asserted Claims in non-technical terms are provided only for shorthand reference and do not in any way modify any terms construed by Judge Benson in the Magistrate's Report.

transferring digital video or digital audio signals from a first party, "the seller," to a second party, "the consumer." The seller and consumer control separate computer memories and are in separate locations connected by telecommunications lines. The seller's memory has a hard disk on which digital video or digital audio signals are stored, and a RAM chip where replicas of the coded signals from the hard disk are temporarily stored prior to transfer to the consumer. The signals are electronically coded *"into a configuration which would prevent unauthorized reproduction of the desired digital video or digital audio signals."* The consumer telephones the seller and purchases the desired signals by providing a credit card number. The stored replica is transferred over the telecommunications lines from the seller's RAM chip to the consumer's memory, where the replica is then stored. (Hayes Decl. Exh. 2, col. 8, line 39, through col. 9, line 8, emphasis added.)

Claim 2 of the '734 Patent is dependent[9] on Claim 1 and begins by reiterating the method set out in Claim 1. It then explains that the consumer has an integrated circuit, to which is attached a control panel, i.e., a "control integrated circuit"[10] which controls and executes the consumer's commands. The consumer uses the control panel to issue a command that initiates purchase of the desired signal from the seller's hard disk. (*Id.*, col. 9, lines 9–16.)

Claim 6 of the '440 Patent is dependent on Claims 1 through 5. Like Claim 1 of the '734 Patent, it discloses a step of *"electronically coding the desired digital video or digital audio signals into a configuration which would prevent unauthorized reproduction of the desired digital video*

*or digital audio signals."* (Hayes Decl. Exh. 3, col. 9, lines 17–21.)

Claim 8 of the '440 Patent is similar to Claim 2 of the '734 Patent and describes the consumer's use of a control panel to initiate the purchase of the desired signal. Because this claim is dependent on Claims 1 through 7, it includes coding of the desired signals into a configuration that would prevent unauthorized reproduction as set out in Claim 6. (*Id.*, col. 9, lines 33–41.)

### 3. *Analysis:*

Defendants argue that there is nothing in the Patents to show that Mr. Hair intended the word "prevent" from having its ordinary dictionary meaning, that is, "to keep from happening, avert." (Defs.' Brief at 19.) Defendants contend that the Patents disclose no methodology or system which explains how the invention would keep unauthorized copying from happening. Nor would one possessing ordinary skill in the art know in 1988 how to incorporate some method or system to do so because then, as now, there was no effective means to prevent unauthorized copying. (*Id.* at 18–20.)

Plaintiff does not argue that either Patent specifically discloses a method for preventing the unauthorized copying. Sight-sound's position is that Defendants' claims of non-enablement rest on "a nonsensical interpretation" of the word "prevent" and that the proper definition is "to impede or present an obstacle to." (Plf.'s Brief in Opp. at 26.) The definition chosen by Defendants is nonsensical because its use would require the Patents to claim "an absolute form of copy protection, a prac-

---

9. "A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers." 35 U.S.C. § 112, fourth paragraph.

10. The term "control integrated circuit" has been construed as "a microelectronics device capable of performing the functions identified in the Patents." (Magistrate's Report at 62.)

tical impossibility." (*Id.* at 27.) Moreover, one skilled in the art in 1988 would have known such absolute protection was unachievable and would have employed a method that would have been reasonable, given the state of the art at that time. (*Id.* at 26–27.)

In construing a term, the court begins by considering the relevant intrinsic evidence, i.e., the claim language, the specification and the prosecution history. *Markman*, 52 F.3d at 979. The analytical focus must begin and remain centered on the language of the claims themselves, "for it is that language that the patentee chose to use to 'particularly point[ ] out and distinctly claim[ ] the subject matter which the patentee regards as his invention.'" *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed.Cir. 2001), *quoting* 35 U.S.C. § 112, para. 2. "Generally speaking, we indulge a heavy presumption that a claim term carries its ordinary and customary meaning." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed.Cir.2002). This presumption is rebutted where the patentee, acting as his own lexicographer, has provided a definition different from the term's ordinary and customary meaning or if he has provided or disavowed an interpretation of the term during the prosecution history. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 and n. 3 (Fed. Cir.1998). Neither party points to any interpretation of the word "prevent" which was provided or disavowed in the prosecution history and thus could be used to shape the scope of the claim, nor is there any evidence that Mr. Hair defined the term "prevent" in the patent claims or specifications.

The phrase in question is "a configuration which would *prevent* unauthorized reproduction of the ... signals." The dictionary on which both parties rely defines "prevent" as "(1) to keep from happening: AVERT; (2) to keep (someone) from doing something: IMPEDE; (3) to anticipate or counter in advance or to present an obstacle." Webster's II New Riverside University Dictionary (1988) at 933.[11] Defendants criticize Plaintiff for passing over the first definition of "prevent" in favor of the second and third entries. (Defendants' Reply Brief in Support of Their Motion for Summary Judgment, "Defs.' Reply Brief," Docket No. 184, at 1.) I find no support for this criticism in the case law and, in fact, courts have clearly done exactly that when doing so allows the claims to be reasonably construed.[12]

11. Although dictionaries are, strictly speaking, extrinsic evidence, an exception has been made for them and for other objective resource works which were publicly available at the time the patent was issued in order to allow the court to determine "the established meanings that would have been attributed to the terms of the claims by those of skill in the art. Such references are unbiased reflections of common understanding not influenced by expert testimony or events subsequent to the fixing of the intrinsic record by the grant of the patent, not colored by the motives of the parties, and not inspired by litigation." *Intellectual Prop. Dev., Inc. v. UA–Columbia Cablevision*, 336 F.3d 1308, 1315 (Fed.Cir.2003) (internal quotation omitted).

12. For instance, in *Intel Corp. v. U.S. Intern. Trade Com'n*, 946 F.2d 821, 835 (Fed.Cir. 1991), the court reviewed the construction by the International Trade Commission of the phrase "permanently programmed." Although the Court did not include in its opinion any dictionary definitions of the word "permanent," a contemporaneous edition of the Random House Collegiate Dictionary (rev. ed.1980 at 988) defines it as "(1) existing perpetually; everlasting; (2) intended to exist or function for a long, indefinite period without regard to unforeseeable conditions; (3) long-lasting." The *Intel* Court affirmed the Commission's construction of "permanently programmed" as requiring only that the devices in question remained programmed for the useful life of the invention under normal

Another dictionary which would have been available in the late 1980s, the Compact Edition of the Oxford English Dictionary (1984) ("OED"), provides as the first contemporary [13] definition, "to stop, keep, or hinder (a person or other agent) from doing something;" the next definition is "to provide beforehand against the occurrence (of something); to render (an act or event) impracticable or impossible by anticipating action; to preclude, stop, hinder." OED at 1337–38, definitions 7 and 8. This latter definition is described as "a chief current sense." The Random House Unabridged Dictionary of the English Language (1987) at 1535 defines "prevent" as "to keep from occurring; avert; hinder; (2) to hinder or stop from doing something." Thus, it is apparent when comparing all three dictionaries that the word "prevent" incorporates both the concept of absolutely stopping or keeping an event from happening (Defendants' choice of definition) as well as merely hindering the event by taking anticipatory action which would make it difficult for the event to occur (Plaintiff's definition).

■ Where a claim term is expressed in general descriptive words, the court will not add a "narrowing modifier before an otherwise general term that stands unmodified in a claim." *Renishaw*, 158 F.3d at 1249. Despite Defendants' protestations in their Reply Brief (at 1) that they have never taken the position the patents are not enabled because they do not teach "an absolute and unbreakable form of copy protection," that position is undercut by comparing the two definitions the parties

propose. If "prevent" is understood to encompass anything less than an act which would result making unauthorized copying totally impossible, that act would fall within the scope of Plaintiff's definition of interposing some hindrance to make it extremely difficult to copy the digital signals. Because any means which would allow copying even one time would essentially do away with Defendants' argument on this point, I must conclude that the definition of "prevent" which they would have me adopt is just such an absolute standard.

■ Where review of the patent language itself fails to resolve an ambiguity as to a disputed term, a court may turn to extrinsic evidence such as expert testimony, prior art, technical treatises and inventor testimony. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed.Cir.1996); *Markman*, 52 F.3d at 980. Such evidence may be used to help the Court understand the claims, but may not be used to vary or contradict the claim language. *Vitronics, id.* Where there is a dispute about the ordinary and customary meaning of the word, the court turns to "the best indicator of claim meaning ... its usage as understood by one of skill in the art at the time of invention." *Moba*, 325 F.3d at 1316, citing *Markman*, 52 F.3d at 986.

Although they never explicitly agree upon the qualifications of one skilled in the art, the parties do agree that in 1988, such a person would have known methods of encryption designed to protect digital signals from unauthorized copying.[14] (Plf.'s

---

operating conditions, reasoning that "permanent" was a relative term. Thus, it is clear that the requirement was not that the devices remained "perpetually" programmed, only that they function "for a long, indefinite period." *Intel*, 946 F.2d at 836.

**13.** Definitions 1 through 6 are classified as obsolete, rare, archaic or theological.

**14.** Defendants specifically refer to public key encryption as one means of deterring unauthorized copying but provide no other examples in the text of their Brief. (Defs.' Brief at 20–21.) I do not take this use of a specific

Brief in Opp. at 30; Defs.' Brief at 20.) According to the Oxford English Dictionary, the verb "to encrypt" means "to convert (data, a message, etc.) into cipher or code, esp. *in order to prevent unauthorized access;* to conceal in something by this means." *See* "OED Online" at http://dictionary.oed.com. (emphasis added).[15] Similarly, the American Heritage Dictionary of the English Language (1992), at 607 defines "encrypt" as "to scramble access codes (to computerized information) so as to *prevent* unauthorized access." (Emphasis added.) If one of ordinary skill in 1988 thought that the purpose of encryption was to prevent unauthorized access, but knew there was no effective means to achieve that goal absolutely, then logically, he or she would have interpreted the phrase "a configuration which would prevent unauthorized reproduction of the ... signals" as meaning a configuration which would incorporate the most effective method of protecting the digital signals from copying, given the capabilities of encryption or other means known at that time. Moreover, there is evidence that those skilled in the art use the word "prevent" in a non-absolute sense, at least today. Plaintiff's expert, Justin Douglas Tygar, Ph.D., points out that the website controlled by CDNow used the phrase "encryption prevents the file from being copied or played without permission." (Plaintiff's Exhibits to Brief in Opposition to Motion for Summary Judgment, "Plf.'s Exhs.," Docket No. 175, Exh. A, Rebuttal Expert Report, "Tygar Rebuttal," at 34–39 and Appendix D thereto, eighth page). James A. Moorer, Ph.D., one of Defendants' experts, also repeatedly used the word "prevent" in describing copy protection methods which he acknowledged did not absolutely stop copying. (Plf.'s Exh. E, Deposition of James A. Moorer, March 3, 2003, "Moorer Depo." at 89–94.) Dr. Moorer conceded that a system he had previously described as a means to prevent copying provided only "a limited deterrent or a limited discouragement to unauthorized copying." (*Id.* at 97.)

### 4. *Conclusion:*

■ In sum, if "to prevent" is given its broader, non-absolute meaning of "to hinder" or "to impede," the Copy Protection Claims are enabled because, as Defendants admit, one of ordinary skill in the art in 1988 would have known methods of converting the digital signals into a code which would make it difficult for someone to copy the downloaded signals without authorization but would also have realized that such methods were far from perfect. Defendants' argument that encryption methods were easily decrypted is only another way of saying that the methods to prevent copying were not absolutely foolproof; it does not mean that the use of encryption did not hinder the unauthorized copying. And it is common knowledge, even among the "computer challenged," that developers of decryption methods are only a short step behind the encrypters.[16]

---

example to imply that encryption was the only means known at the time to deter copying. (*See* Plf.'s Exhibits, Docket No. 175, Exh. E, Deposition of James A. Moorer, at 18–20, discussing watermarking.) Dr. Moorer described watermarking and encryption as providing "limited technological barriers to copying. Neither are [sic] absolute." They provide "a measure of protection ... [and] tend to deter someone from making unauthorized copies." (*Id.* at 20–21.)

15. I note that the Random House Collegiate Dictionary (1980) and the Compact Edition of the OED (1984) do not define the words "encrypt" or "encryption."

16. *See, e.g., Vault Corp. v. Quaid Software Ltd.,* 847 F.2d 255 (5th Cir.1988). Vault developed a computer program which protected other programs from unauthorized copying. In response, Quaid developed a program which circumvented Vault's program. As

I therefore conclude that Plaintiff's definition of "prevent" set out at page 29 of its Brief in Opposition, i.e., "presenting a technical obstacle sufficient to impede the ordinary customer from duplicating the purchased digital audio signal" is appropriate to the facts of this case. Since Defendants' argument for lack of enablement rests only on its overly restrictive definition of "prevent," their Motion for Summary Judgment in this regard must be denied.[17]

**B. Are the '734 and '440 Patents Invalid As Anticipated by Prior Art?**

Claims 14 and 26 of the '734 Patent and Claims 11 and 12 of the '440 Patent describe "a single unit" that performs all the functions of purchasing, downloading and playing digital audio music. (Plf.'s Brief in Opp. at 3.) Defendants argue that these "Single Unit Claims" are anticipated by prior art and are therefore invalid under 35 U.S.C. § 102, specifically by a Japanese patent published in December 1987 and thus prior to the earliest date on which Sightsound Patents claim priority. (Defs.' Brief at 23–29.) Those same Claims are also anticipated by a subscription service in public use in the United States more than one year prior to Mr. Hair's June 13, 1988 filing. (*Id.* at 29–34.)

**1. Relevant Law:**

Section 102, in relevant part, provides that a person shall be entitled to a patent unless:

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

35 U.S.C. § 102(a) and (b).

Succinctly stated, a party arguing that a patent is invalid because it was anticipated is arguing that the invention is not, in fact, new. Anticipation "requires that the same invention, including each element and limitation of the claims, was known or used by others before it was invented by the patentee." *Hoover Group, Inc. v. Custom Metalcraft, Inc.,* 66 F.3d 299, 302 (Fed.Cir. 1995).

 "The first step in any invalidity analysis is claim construction.... The second step, determining whether a prior art reference discloses each and every limitation of the claim expressly or inherently is a factual question reviewed for substantial evidence. This factual question is contingent upon the proper claim construction. A claim limitation is inherent in the prior art if it is necessarily present in the prior art, not merely probably or possibly present. The dispositive question regarding anticipation is whether one skilled in the art would reasonably understand or infer from the prior art reference's teaching that every claim [limitation] was dis-

Vault issued new versions of its copy protection software, Quaid modified its software to overcome those new protective measures.

**17.** Defendants also argue in passing that the Sightsound Patents describe the copy protection element as "new and improved" and therefore, the Patents should be considered invalid for failure to provide any features that

are "both novel and better than what was previously known." (Defs.' Brief at 21; *see also* Defs.' Reply Brief at 1.) However, the point is never developed beyond this conclusory statement and I decline to address it further, not knowing what argument Defendants might make in this regard.

closed in that single reference." *Akamai Techs. v. Cable & Wireless Internet Servs.*, 344 F.3d 1186, 1192 (Fed.Cir.2003) (Internal citations and quotations omitted).

■ Courts interpreting and applying Section 102 have concluded that in order to find a patent invalid for anticipation, the party opposing the patent must come forward with clear and convincing evidence that "the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Advanced Display Systems, Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed.Cir. 2000).

"Whether a prior art reference anticipates a patent claim is a question of fact." *Finnigan Corp. v. ITC*, 180 F.3d 1354, 1362 (Fed.Cir.1999). However, summary judgment on anticipation may be appropriate "if the record reveals no genuine dispute of material fact" such that "no reasonable jury could find that the patent is not anticipated." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1327 (Fed.Cir.2001).

### 2. Anticipation by Akashi:

Defendants argue that the Single Unit Claims are anticipated first by a patent issued on December 10, 1987, to a Japanese inventor, Hisanobu Akashi, under the title "Automated Sales System for Music on Record Albums" ("Akashi" or "the Akashi Patent").[18] (Defs.' Brief at 23.) According to Defendants, Akashi teaches a system involving a first party host comput-er which stores digital music owned by a record company and a second party computer, referred to as a "recording reproducing apparatus," located in the second party's home, i.e., remote from the host computer. The second party connects his computer to the host computer via telecommunications lines and uses his computer monitor to search the first party's database of digital music on the host computer. He then selects and purchases the desired music through an "automated sales system," the music is transferred over telecommunications lines and downloaded to his computer, which is capable of recording and playing digitized music. (Defs.' Brief at 7; *see also* Exh. A thereto providing a detailed comparison of Akashi with the '440 and '734 Patents.) Because Akashi was published approximately six months before the application for the '573 Patent was filed in June 1988, Akashi qualifies as prior art to the Sightsound Patents.

Claim 14 of the '734 Patent is dependent on Claims 11 through 13. Collectively, Claims 11 through 14 disclose separate seller and consumer memories and control units, including control panels and integrated circuits, which are remote from each other; a transmitter controlled by the seller and a receiver controlled by the consumer; seller's sales RAM; the consumer's incoming and playback RAM in electrical communication with the seller's integrated control circuit; and the consumer's video display and speakers. The two memories are connected by telecommunications lines, including telephone lines. Money is transferred from the consumer to the seller electronically. The desired

---

**18.** *See* Laid Open Kokai Patent Application Sho 61–127327 filed by Hisanobu Akashi and published as Patent Publication (A) Sho 62–284496 of the Japanese Patent Office. (Hayes Decl. Exh. 15.) Plaintiff has stipulated to the accuracy of Defendants' translation of the original Japanese language patent also provided as part of Exh. 15. (*See* Hayes Decl. Exh. 16.) Foreign patents are capable of anticipating United States patents. 35 U.S.C. § 102(a), (b), and (d); *In re Kathawala*, 9 F.3d 942, 945 (Fed.Cir.1993).

digital audio or video signals are transferred from the seller's memory to the consumer's memory, which includes a hard disk, and stored there. (Hayes Decl. Exh. 2 at col. 10, line 51 through col. 11, line 47.)

Claim 26 of the '734 Patent summarizes much of the preceding Claims and discloses the consumer's control panel and speakers connected to the consumer's receiver for playing the desired digital audio signal. The receiver and speakers are controlled by a control panel, which the consumer also uses to choose the desired signal from the seller's hard disk. (*Id.* at col. 14, line 32 through col. 15, line 20.)

Defendants describe Claim 11 of the '440 Patent as "essentially the same as Claim 6" except that it discloses using the consumer's control panel to purchase the desired digital video or audio signals from the seller, as well as to command and control the playing of the desired signals. (Defs.' Brief at 5.)

Claim 12 of the '440 Patent states that the seller and consumer each have separate control units in separate locations, with separate memories connected by telecommunications lines used to conduct electronic sale of the desired digital signals by the seller to the consumer. The signals are transferred from the seller's memory to the consumer's memory after the sale. The consumer has a means for playing the desired signals, which is controlled by the control panel of his or her control unit. (Hayes Decl. Exh. 3 at col. 10, lines 28–54.)

Defendants discuss in great detail the numerous ways in which they believe Akashi anticipates Claims 14 and 26 of the '734 Patent. (Defs.' Brief at 24–28.) However, they repeatedly rely on the assumption that computers capable of performing the functions Akashi described would "necessarily" include certain elements,[19] a point with which Plaintiff takes issue. Defendants concede that these disclosures are only "inherent" in the Akashi patent.

Plaintiff argues that Akashi fails to disclose: (1) hardware associated with the electronic payment and/or sale of digital audio signals; (2) a single unit configured with speakers for playing the downloaded digital signals; or (3) a hard disk used by the purchaser to store the digital signals. Thus, Akashi cannot and does not anticipate explicitly the Single Unit Claims and thus the inherency argument fails as a matter of law. (Plf.'s Brief in Opp. at 7.)

### a. *Electronic sales:*

Although the issue of anticipation is a question of fact, before anticipation may be addressed, a court must first properly construe the claims before it, a question of law. *Akamai Techs.*, 344 F.3d at 1195, n. 4. Here, Judge Benson wrote, for example, in the construction of the phrase "means [or a mechanism] for electronically selling the desired digital video or digital audio signals" as used in Claims 4 through 8 and 10 of the '734 Patent and Claims 12 through 15 of the '440 Patent, that

> the specification discloses that the first party control integrated circuit will be "designed to control and execute the ... commands of the [first party] and regulate the electronic transfer," and that it will be the "means or mechanism" for charging the account of the buyer. It follows, then, that the "means" for electronically selling, which includes the transfer of the product in return for

---

19. For example, Defendants state: "A computer capable of performing the functions disclosed by Akashi host computer would *necessarily* include capacity for bulk memory; .... personal computers in 1988 *would* have included a hard disk; .... compact disk decks at that time would *necessarily* include a playback capability which would require speakers." (Defs.' Brief at 24–28, emphasis added.)

electronic payment, is a properly programmed control integrated circuit. (Magistrate's Report at 70.)

Similarly, he found that the '734 Patent Claim 26 (referring to "a means or mechanism for the first party to charge a fee to the second party") and Claim 14 (referring to a "means or mechanism for transferring money electronically via a telecommunications line") each required a structure in the form of "an appropriately programmed control integrated circuit" to accomplish the purpose of the specification. (Magistrate's Report at, respectively, 71 and 72.)

Plaintiff first argues that Akashi does not anticipate Claims 14 and 26 because it does not disclose the means to purchase digital audio signals using a specified structure in the seller's or buyer's unit. According to the express language of the Claims, as construed by the Court, each of the four Single Unit Claims requires an electronic sale to occur through a specific structure. (Plf.'s Brief in Opp. at 7.) Sightsound argues that Defendants concede that Akashi does not disclose these elements and that the record fails to support Defendants' argument that the missing disclosures are "inherent" in the Akashi reference. (*Id.*)

Defendants contend that the Akashi Patent incorporates a system for the "automated sale" of music on record albums using a telephone line. (Defs.' Brief at 27.) This anticipates a "means or a mechanism for transferring money electronically via telecommunications lines" as found in Claim 14 of the '734 Patent and the means

or mechanism for the first party to charge the second a fee as found in Claim 26. (*Id.*) According to Defendants, "automated sales" in Akashi is the same as "electronic sales" in the Sightsound Patents. They argue this is evidenced by Mr. Hair's admission that in 1988, one skilled in the art would have known that electronic sales inherently involved a transfer of money by providing a credit card number over telecommunications lines. (*Id.*, *citing* Hayes Decl. Exh. 31, Declaration of Arthur Hair before the PTO, May 5, 1992.) [20] Defendants conclude that Akashi "inherently" anticipates the hardware and software used for electronic payment because it has an identical function, or at the very least a structure equivalent to, the electronic sales means and function claims of Claim 14 and the mechanism described in Claim 26. [21] (Defs.' Brief at 28.)

 Under the doctrine of inherency, a prior art reference will be deemed to anticipate a subsequent claim even if an element which is not expressly disclosed "is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill." *Cont'l Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed.Cir.1991). If the prior art necessarily functions in accordance with, or includes, the claimed limitations, it anticipates. *See In re King*, 801 F.2d 1324, 1326 (Fed.Cir.1986). "Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not suffi-

20. Mr. Hair stated in his Declaration that "electronically sell" and "electronic sales" inherently assume transferring money by providing a credit or debit card number and that this process is "well known." (Hayes Decl. Exh. 31 at 2.) Plaintiff argues that this statement is of limited evidentiary value because it was made in the context of describing his own invention and the generic concept of electronic sales, not in the context of how one skilled in the art would understand the phrase "automated sales system" as used in the Akashi Patent. (Plf.'s Brief in Opp. at 9.)

21. Defendants refer to Claim 11 here but I assume from the context they are actually referring to Claim 26 of the '734 Patent.

cient." *In re Robertson,* 169 F.3d 743, 745 (Fed.Cir.1999), *quoting In re Oelrich,* 666 F.2d 578, 581 (CCPA 1981). That is, inherency requires that the missing descriptive material is "necessarily present," not merely probably or possibly present, in the prior art. *Trintec Indus., Inc. v. Top–U.S.A. Corp.,* 295 F.3d 1292, 1295 (Fed.Cir. 2002). Whether a claim limitation is inherent in a prior art reference is a question of fact. *In re Schreiber,* 128 F.3d 1473, 1477 (Fed.Cir.1997.)

██ As Plaintiff points out, Defendants' own experts conceded that there were means to effect the sale of digital music according to the Akashi Patent which, unlike the '734 and '440 Patents did not require electronic sales over telecommunications lines. (Plf.'s Brief in Opp. at 9.) Dr. Michael Shamos, for instance, admitted that "electronic sales" could include "selling over the telephone by voice." (Plf.'s Exh. G, Deposition of Michael Shamos, "Shamos Depo.," at 82). Dr. Moorer admitted that a telephone call between human beings (a purchaser and a person employed by the record company who owned the host computer) could communicate the credit card information necessary to initiate the download of the music. (Moorer Depo. at 176–77).[22]

More importantly, a detailed review of the Akashi Patent reveals no means or method whatsoever of effecting payment. (*See* Hayes Decl. Exh. 15, verified translation of Akashi Patent.) Although the Akashi Patent refers several times to "an automated sales system," or "automated sales

of music," neither the section describing the means for solving the problem nor the embodiment includes a step describing how payment is either demanded or made. The word "automatic," I conclude, could modify the means by which the music company distributes its recordings, i.e., via download from a host computer to the ultimate consumer, as compared to the conventional means of manufacturing compact disks or long play record albums to be sold via retail stores. (Akashi Patent at 2, ¶¶ 2–3.) Because Akashi never describes any method as to how payment is made, the ability to effect a sale by the transfer of credit card information directly from computer to computer is, at best, a *possibility,* which, as noted above, does not satisfy the requirements for demonstrating inherency. Thus, the Akashi Patent does not anticipate either directly or inherently the limitation in Claim 14 which requires "an appropriately configured integrated circuit within the buyer's control unit" as the means for transferring money electronically from the buyer to the seller and the limitation in Claim 26 which requires "an appropriately programmed integrated circuit in seller's control unit" to charge a fee for the download of the signal.

Defendants also argue that Akashi anticipates Claims 11 and 12 of the '440 Patent, specifically the buyer's use of a control panel to enter commands to purchase the desired signals and to command playback of the downloaded signals. (Defs.' Brief at 28–29.) They argue one of ordinary skill in the art would recognize the "control unit

**22.** Defendants point out that Dr. Moorer later amended his testimony, stating that on further reflection, it was his opinion that Akashi excludes the possibility of "calling someone up" to provide a credit card number, that is, "it does not require someone to call up on a telephone." (Defs.' Reply Brief at 2; *see also* Moorer Depo. at 183–84.) As discussed in the paragraph following this footnote, my conclu-

sion is that the Akashi Patent discussed no specific means of effecting payment. Therefore, Dr. Moorer's conclusion that Akashi *excludes* the possibility of a person-to-person verbal communication of payment information is as speculative as his earlier conclusion that the Akashi Patent *could* allow verbal transfer of payment information.

11" described in Akashi as being a keyboard and mouse combination used to generate the access signal, search the host computer database, select the signal to be downloaded, and "implicitly" command playback. Thus, to the extent Claims 11 and 12 are enabled, they are anticipated by Akashi and therefore invalid. (*Id.* at 29.)

I find that Akashi differs in at least two ways from Claims 11 and 12. First, as construed by Judge Benson, the control panel described in Claims 11 and 12 of the '440 Patent is also used to electronically purchase the signals in addition to the tasks described by Defendants in the preceding paragraph. (Magistrate's Report at 70–72.) Since there is no description in the Akashi Patent about how the electronic sale is to be effected, Akashi's control unit 11 cannot be said to anticipate using the control panel for that step. Secondly, since Akashi presents only the possibility of using the recording reproducing apparatus for playback of the signals (as discussed in more detail immediately below), the use of control unit 11 to command that playback is also only a possibility. I find therefore, that at most, Akashi describes only the possibility of using its control unit 11 in a way which anticipates the use of the '440 Patent control panel, not the necessity as required by law.

### b. *A single unit with speakers for playing the digital audio signals:*

 Dr. Tygar states that Claim 14 of the '734 Patent discloses that the consumer will store the digital audio signals in his computer's RAM before they are played and requires speakers connected to the control integrated circuit of his unit. (Tygar Rebuttal at 16–17.) Claim 26 of the '734 Patent also requires speakers connected to the buyer's computer memory. (*Id.* at 21.) Similarly, in the '440 Patent, Claim 11 requires the specific step of entering commands through an input device to play downloaded signals and Claim 12 requires a control integrated circuit connected to stereo speakers. (*Id.* 26, 28.) I agree with Plaintiff that Dr. Tygar's description of the requirement for speakers as part of the Hair invention conforms to the Magistrate's construction of these claims. (*See* Magistrate's Report, e.g., at 72–74.)

Defendants argue that Akashi inherently discloses speakers attached to a "recording reproducing apparatus," through which the digital audio signals are played. (Defs.' Brief at 25.) According to Defendants, Akashi describes the use of a compact disk deck as an example of what the apparatus could include and, in 1988, compact disk decks "would necessarily" include speakers. (*Id.*) Plaintiff argues that notwithstanding Defendants' arguments to the contrary, Akashi does not discuss or even suggest that it incorporates a playback RAM, an input device for the digital audio signals, speakers, or a connection between the speakers and the consumer's control integrated circuit. In fact, Sightsound contends, Akashi is "completely silent" about how to play back the digital audio signals. Moreover, a reference in the Akashi Patent to using a compact disk deck as an example of its incorporated recording reproducing apparatus does not constitute an inherent disclosure because, as Defendants' expert conceded, such disk decks in 1988 might not *necessarily* include speakers. (Plf.'s Brief in Opp. at 12 *citing* Shamos Depo. at 87.)

Contrary to Defendants' arguments, a review of the Akashi Patent results in the conclusion that it does not inherently disclose speakers connected to the recording reproducing apparatus. I agree with Plaintiff that Akashi does not describe how the downloaded music is to be played, only how it is to be recorded. (Plf.'s Brief in

Opp. at 12.) That is, once the host computer receives a signal requesting a specific composition, "the data representing the music . . . is then downloaded to the RAM in the recording apparatus and digitally recorded. . . . The recording reproducing apparatus may either be a digital audio tape recorder or a compact disk deck that employs a write-once, read-many recordable optical disk that allows data to be read immediately after the data is written." (Akashi Patent at 2.) The next paragraph in the embodiment section describes the components of the apparatus and the peripheral equipment to which the apparatus is connected. Speakers are not mentioned. Nor is any method for playback discussed in the step-by-step description of the operational procedure; in fact, the procedure ends with the step of writing the downloaded data to a recordable optical disk. (*Id.* at 3.) Similarly, the description of the schematic diagrams of "one embodiment of a recording reproducing apparatus" does not refer to any means to play back the downloaded music.

In their Reply Brief, Defendants argue that Akashi specifically discloses RAM in the recording reproducing apparatus which is to be used for playback and playback can only be achieved by means of speakers which are needed to make sound audible to the human ear. (Defs.' Reply Brief at 3.) The two references to RAM in the Akashi Patent relate only to the recording phase of the operation, not playback. (Akashi Patent at 2, ¶ 5; 3 at ¶ 6e.) Even if I were to accept Defendants' argument that the RAM *could* be used to perform playback as well as the disclosed recording, the only conclusion to be drawn is that Akashi *possibly* discloses a means by which the downloaded signals can be played back through inherently disclosed speakers, not the necessity of integral speakers as disclosed in the Sightsound Patents.

### c. *An integral hard disk to store the downloaded signals:*

Finally, Defendants argue that the recording reproducing apparatus described in the Akashi Patent would have taken the form of a personal computer including a hard disk on which the buyer would store downloaded digital signals. (Defs.' Brief at 25.) Plaintiff contends that not only does Akashi describe the storage medium as a digital tape recorder or a compact disk deck that uses optical disks (*see* Akashi Patent at 2, ¶ 6), there is no requirement in the Akashi invention for hard disk storage in the buyer's apparatus, much less any evidence that it would be used to store the downloaded signals. Sightsound argues that even if one concedes that a personal computer *could* have been used to store the data, not all personal computers in 1988 contained a hard disk. Therefore, at best, disclosure of a hard disk to store the downloaded signals cannot be inherent in the Akashi Patent because existence of such a disk is merely possible, not required. (Plf.'s Brief in Opp. at 13.)

Defendants attempt to refute this argument by pointing out that contrary to Plaintiff's interpretation of Claim 14 of the '734 Patent, that Claim requires only that the signal be stored in the buyer's "memory," a term which may or may not include a hard disk. Nor does Claim 11 require that the downloaded signals be stored on a hard disk as opposed to another form of memory. Moreover, according to Defendants' experts, any computer in 1988 capable of downloading digital audio signals would have included a hard disk. (Defs.' Reply Brief at 3–4.)

Accepting Defendants' argument for sake of analysis, I conclude that at best, it offers only one claim of the Sightsound Patents which was disclosed in the Akashi Patent. The standard for showing invalid-

ity due to anticipation is much higher, i.e., would one skilled in the art reasonably understand or infer that *every* claim was disclosed in that single reference? *Akamai Techs.*, at 1192. Having concluded that at least two other claims of the Sightsound Patents were not disclosed by Akashi, I conclude that Akashi did not anticipate the Hair invention in its totality.

### 3. Anticipation by PAN:

The Performing Artists' Network ("PAN") is described by Defendants as a "music-oriented online subscription service" which offered its members the opportunity to communicate with each other via a mainframe computer. (Defs.' Brief at 8.) A member established an electronic account using her personal computer with a modem to connect to the mainframe and providing her credit card information. She could then connect to the mainframe at any time, search the directory listings of PAN databases, and select a file to be transmitted over telecommunications lines back to her computer where it was stored. The fees and connect time charges associated with a member's use of the PAN system were automatically billed to her credit card account. (*Id.*)

Defendants claim that this subscription service, which was in public use as of 1984, i.e., more than one year before the June 1988 filing date for the Sightsound Patents, anticipates the Single Unit Claims. (Defs.' Brief at 29.) Specifically, Defendants argue that the PAN host mainframe corresponds to the seller's mainframe described in Claims 14 and 26; that the PAN member's personal computer corresponds to the buyer's computer and memory; that using a dial-up network to connect the PAN member's computer to the mainframe to search the database and download data via modem corresponds to using telecommunications lines for the same pur-

poses as described in the Sightsound Patents; and that establishing an account by providing credit card information over telecommunications lines and charging for the services anticipates the "electronic sales" component of the Sightsound Patents. In addition, the PAN member's use of her personal computer to access the mainframe, search the database and select the data to be downloaded satisfies the use of the control panel described in Claim 11 to purchase the desired signals. Claim 12 is similarly satisfied by the PAN member using her personal computer to command and control the playback function. Defendants conclude, therefore, that all claim elements and limitations of the Single Unit Claims are anticipated by PAN. Thus, the Patents should be invalid pursuant to 35 U.S.C. § 102(b). (Defs.' Brief at 30–34; *see also* Exh. B thereto, comparing Sightsound Patent Claims to the PAN system.)

First, I note that nearly all of the evidence relating to PAN is based on the uncorroborated testimony of PAN's founder, Perry Leopold. (*See* Hayes Decl. Exh. 17, Deposition of Perry Leopold dated February 27, 2001, "Leopold Depo.") "The case law is unequivocal that an inventor's testimony respecting facts surrounding a claim of derivation or priority of invention cannot, standing alone, rise to the level of clear and convincing proof." *Finnigan Corp.*, 180 F.3d at 1367 (internal quotation omitted). This rule applies as well when a witness testifies concerning public use of the invention one year before the patentee filed his patent, as Mr. Leopold does here, even if that witness is presumed to be an uninterested in the outcome of the litigation but is testifying on behalf of an interested party. *Finnigan Corp., id.* at 1367–68 ("A witness who testifies to antedating the invention of the patent-in-suit can be expected to derive a sense of professional or personnel accomplishment in being the

first in the field, and in this sense is not uninterested in the outcome of the litigation, even if that witness is not claiming entitlement to a patent"); *see also Woodland Trust v. Flowertree Nursery, Inc.,* 148 F.3d 1368, 1371 (Fed.Cir.1998), setting out criteria for evaluating credibility of such witnesses.

▉▉▉ Plaintiff contends that Defendants ignore the Court's claim construction by arguing that PAN anticipates the Sightsound Patents. (Plf.'s Brief in Opp. at 14.) At a minimum, PAN fails to disclose the electronic sales aspects of the single unit claims. (*Id.*) Under the Court's construction, each Single Unit Claim requires that the electronic payment be made *in exchange for* the downloaded digital audio signals. By comparison, PAN members paid a monthly subscription fee and connect time fees, no matter whether they downloaded any digital signals or not. To the extent that it could be claimed that they paid *for* audio signals, they paid only for the time that it took to download them, not for the signals themselves as in the Hair invention. (*Id.* at 14–16.)

Defendants argue that characterizing the PAN member's payments as subscription and connect time fees does not alter the fact that those fees were paid in exchange for a product or service. If a subscriber went on-line specifically to download music, that is what the subscription and connect time fees paid for. (Defs.' Reply Brief at 4.)

I believe this argument is belied by the Magistrate's claim construction analysis. In his claims construction, Judge Benson found the correlation between making a payment and receiving "the desired digital signals" to be "manifest" in those specifications which address "transferring money electronically," or "providing a credit card number ... so the second party is charged money." (Magistrate's Report at 46.) He

also refers to that portion of the '734 Patent which describes "the step of selling electronically by the first party to the second party ... the desired ... signals." (*Id.* at 49.) In construing the order in which the steps of the operation are to occur, Judge Benson also had the opportunity to construe Claim 26, where he concluded that the transfer of the digital audio or video signals "is expressly said to occur after the signal has been 'sold' to the second party." (*Id.* at 83.) Each of these references to the language of the claims implies that the *quid pro quo* incorporated in the Sightsound Patents is the payment of money for the selected digital audio signals. A reasonable fact finder could conclude, however, that the *quid pro quo* in the PAN system was payment of money for access to the PAN host computer.

The distinction between PAN and the Hair invention can readily be shown by two hypothetical examples. A potential buyer who electronically connected to the Sightsound computer, browsed for a bit, but decided not to download any music, would not be charged. As the Magistrate discussed in his Report, providing a credit card number in order to allow electronic transfer of money does not have to occur before connecting the seller's memory to the buyer's memory, and, in fact, need not occur at any specific point except prior to transmission and storing of the digital signals. (Magistrate's Report at 81–82.) Even if the eventual embodiment of the invention required the buyer to provide a credit card number as a preliminary step to accessing the music database, no money would be transferred until the buyer selected a digital signal for download. In sum, a hypothetical Sightsound user could connect and browse without incurring any cost at all.

On the other hand, a PAN user provided a credit card number and incurred a

monthly fee simply for the privilege of being a PAN subscriber. If she never logged on to the PAN mainframe during a given month, she would still incur the subscription fee and an account maintenance fee. In addition, every minute she was online, browsing the PAN database—even if she did not download any music—she paid connect fees which were automatically charged to her credit card. If she decided to download digital audio signals, she incurred additional connect time fees, although as a "strategic decision," PAN had chosen not to make additional charges for the signal itself. Therefore, at most, only some portion of her monthly credit card charges can logically be ascribed to payment for selected digital audio signals. (*See*, generally, Leopold Depo. at 46–48, 60–61, 94, 166–67 and 188–89.)

As these examples make clear, a Sightsound user would exchange money for a product, i.e., digital signals, and a service, i.e., making music available on a database, whereas a PAN user exchanged money for a service, i.e., access to a database but, only potentially, for a product. Because the PAN system offers only the possibility of exchanging money for digital audio signals, but does not require it, it does not satisfy the legal standard for anticipating the Single Unit Claims.

Moreover, nothing in the Leopold deposition or any other description of the PAN system reveals how the user effected playback. Since PAN members did not need to purchase a specific type of equipment to access the PAN database, theoretically, there could have been thousands of different personal computer configurations in use, some of which could have had no means of playback. That is, the PAN member could have stored the downloaded signals on a medium that was controlled by some means other than the control panel

of her computer. (Leopold Depo. at 79.) This contradicts the Single Unit Claims which require playback to be effected by the same device which controls other processes such as download.

### 4. Conclusion:

Despite Defendants' arguments, I find they have not satisfied their burden of coming forward with evidence which would compel a reasonable jury to find that the Sightsound Patents are invalid pursuant to 35 U.S.C. § 102(a) or (b) because they were anticipated by Akashi or PAN. Summary judgment on this question must therefore be denied.

### C. Are the '734 and '440 Patents Invalid Because They Were Obvious?

Defendants' final argument is that the Sightsound Patents should be found invalid because they would have been obvious in 1988 to one skilled in the art who was familiar with the Akashi Patent, the PAN system, or other public disclosures discussed below. (Defs.' Brief at 34.) Again, I conclude that Plaintiff has pointed to a sufficient number of issues of material fact with regard to this question that summary judgment for Defendants cannot be granted.

### 1. Relevant Law:

According to 35 U.S.C. § 103(a), "a patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said

subject matter pertains." [23]

The ultimate conclusion of obviousness is a matter of law which depends on four factual inquiries, "all of which must be considered by the trier of fact: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) any objective indicia of nonobviousness." *Crown Operations Int'l Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed.Cir.2002) (internal citations omitted); *see also Graham v. John Deere*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), and *Akamai Techs.*, at 1195. The "objective indicia" of nonobviousness, i.e., secondary considerations, include commercial success, a long-felt but unresolved need for the invention, the failure of others to achieve the claimed invention, and copying. *Graham, id.* at 1192; *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1000 (Fed.Cir.), *cert. denied sub nom. BIC Leisure Prods. v. Windsurfing Int'l, Inc.*, 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986). The correct inquiry is not whether each element existed in the prior art, but whether the prior art made obvious the invention of the patent-in-suit as a whole. *Hartness Int'l, Inc. v. Simplimatic Eng'g Co.*, 819 F.2d 1100, 1108 (Fed. Cir.1987).

While a single prior art reference may render a claim obvious, "there must be a showing of a suggestion or motivation to modify the teachings of that reference to the claimed invention in order to support the obviousness conclusion." *SIBIA Neurosciences v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1356 (Fed.Cir.2000). On the other hand, where the party alleging obviousness relies on multiple prior art references, the conclusion that the invention is obvious "cannot be based on the hindsight combination of components selectively culled from the prior art to fit the parameters of the patented invention, [rather] there must be a teaching or suggestion within the prior art, within the nature of the problem to be solved, or within the general knowledge of a person of ordinary skill in the field of the invention, to look to particular sources, to select particular elements, and to combine them as combined by the inventor." *Crown Operations*, 289 F.3d at 1376. What the prior art teaches and whether it teaches away from the claimed invention are questions of fact. *In re Bell*, 991 F.2d 781, 784 (Fed.Cir.1993).

At the summary judgment stage, the party claiming obviousness must come forward with clear and convincing evidence to satisfy the first three prongs of the test set out in *Graham*, i.e., (1) the scope and content of the prior art, (2) differences between the prior art and the allegedly infringed claims, and (3) the level of ordinary skill in the pertinent art. *Id.*, 383 U.S. at 17, 86 S.Ct. 684; *see also Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1350 (Fed.Cir.2000). If the defendant satisfies the *prima facie* showing of obviousness, the burden shifts to the patent owner to come forward with objective evidence demonstrating secondary considerations of non-obviousness, i.e., the fourth *Graham* factor. *Winner Int'l, id.*

### 2. Defendants' Examples of Prior Art Giving Rise to Obviousness:

Defendants argue that the Asserted Claims would have been obvious to a person of ordinary skill in the art because the subject matter of those claims consists "of

---

**23.** Although Defendants also purport to rely on 35 U.S.C. § 103(b) (Defs.' Brief at 34), that paragraph pertains to patents involving specifically enumerated biological processes irrelevant to the patents herein.

an utterly conventional implementation of two technologies: the absolute basics of the download of digital audio and the absolute basics of electronic sales." (Defs.' Brief at 37.) They claim that "there are so many routes to demonstrating the obviousness of the enabled Asserted Claims that it would be extremely redundant to go through a detailed analysis for all prior art references." (*Id.* at 38.) They concentrate on four single references—Akashi and PAN (discussed above), a non-technical article published in 1986, and descriptions of technology developed in the mid–1980s by Compusonics Corporation. The arguments with regard to Akashi and PAN are parallel, i.e., that each discloses the identical subject matter as the Sightsound Patents and that any differences in implementation of particular functions between Akashi or PAN and the Sightsound Patents are so insignificant that someone with a working knowledge of Akashi or PAN would find everything in the Sightsound Patents to be obvious and would learn nothing new from reading them. (*Id.* at 39–41.) Rather than review the arguments with regard to Akashi and PAN in detail, I will concentrate on the other prior art references[24] which Defendants argue would have allowed one skilled in the art to find the Sightsound Patents obvious.

■ Defendants argue that the essence of the entire Hair invention is encapsulated in an interview with Jimmy Bowen, president of the Nashville Division of MCA Records, published in October 1986.[25] In that interview, Bowen stated:

I see the time down the road, probably 10 years, when you'll be able to dial a series of numbers on your telephone and get a digital album over the phone line *into your incoder* [sic] *in your home.* In five minutes, you can have a new album. It's on your telephone bill or it's on your credit card or whatever.

(Exhibits to the Declaration of Michael I. Shamos, Docket No. 165, Exh. 1, "the Bowen Article.")

Defendants contend that this description by Bowen "includes all of the aspects of the asserted claims except for the copy prevention feature. . . . A straightforward and completely conventional implementation [of the method described in the Bowen Article] by one of ordinary skill in the art would yield the same invention that the Hair patents assert." (Defs.' Brief at 38.)

Defendants offer another indication of obviousness arising from the fact that by 1984, Compusonics Corporation had developed a system that incorporated all the necessary hardware components for transmission and downloading of digital audio signals over telecommunications lines between two computers for storage and playback. (Defs.' Brief at 41–42; *see also* Hayes Decl. Exh. 18.) Compusonics publicly demonstrated its system in 1985 and "expressly contemplated the application of

---

**24.** Defendants also summarize two other instances of alleged prior art, specifically a company called Telephone Software Connection, founded in 1979, by which consumers could purchase and download software via telephone connections, and a patent issued in 1978 to Robin Elkins for an "Audio Storage and Distribution System" which allowed selection and transmission of digital signals over a telecommunications line. (Defs.' Brief at 11–12.) These are not used by Defendants as examples of prior art references in either the anticipation or obviousness arguments and thus I do not consider them herein.

**25.** Plaintiff points out that the Bowen Article was considered by the Patent and Trademark Office during prosecution of the '440 Patent. (Plf.'s Brief in Opp. at 19, n. 12.) When the prior art was before the PTO examiner during prosecution, the burden of the party alleging invalidity is "especially difficult." *Hewlett–Packard Co. v. Bausch & Lomb,* 909 F.2d 1464, 1467 (Fed.Cir.1990).

their system to the sale and teledelivery of digital audio music into the consumer's home." (Hayes Decl. Exhs. 19–21; 35.) According to Defendants, the Compusonics system exactly corresponded to the claims of Sightsound Patents, and any differences in implementation between the two were "so trivial" that one of ordinary skill in the art who was familiar with the Compusonics system would find the Sightsound Patents obvious. (Defs.' Brief at 41–42.)

Finally, Defendants argue that someone familiar with the art of digital audio transmission in 1988 would also be familiar with the concept of copy prevention as applied to the arts of digital download and electronic sales. (Defs.' Brief at 43–44.) Therefore, any elements of copy protection derived from the Sightsound Patents would have been obvious from prior art suggested by (1) a patent issued to Charles Freeny in 1985 ("the Freeny Patent"), (2) reports published in 1983 and 1986 ("the IRD Reports"); and (3) a patent issued to Martin Hellman in 1987. When the prior art of copy protection suggested by these references is combined with Akashi, PAN, Compusonics or Bowen, the invention claimed in the Sightsound Patents would have been obvious to a person of ordinary skill in the art in June 1988. (*Id.* at 44.)

### 3. Plaintiff's Arguments in Opposition to the Obviousness Claims:

 In response, Plaintiff makes three arguments. First, Sightsound argues that Defendants have not presented "a rigorous comparison" of the claims to the prior art references, but offer "little more than the unsupported accusation that Mr. Hair's claimed invention is so simple that it does not deserve a patent." (Plf.'s Brief in Opp. at 16–18.) Sightsound contends that summary judgment must be denied because Defendants have failed to establish the scope and content of the prior art, the level of ordinary skill in the art, and differences between the Hair invention and the prior art. Second, Defendants have also failed to show that there was "a suggestion or motivation to modify the prior art teaching to obtain the claimed invention." (*Id.* at 17, *quoting Beckson Marine, supra,* 292 F.3d at 727.) Particularly, with regard to the copy protection elements, Plaintiff contends that it has presented evidence contradicting the contention that one skilled in the art would have combined the cited references to arrive at the Sightsound Patents and that references cannot be combined when a reference teaches away [26] from the combination. Finally, Plaintiff points out that Defendants have entirely omitted any discussion of secondary considerations of non-obviousness. (Plf.'s Brief in Opp. at 31–36.)

### 4. Analysis:

 I agree with Plaintiff that there are questions of material fact with regard to the obviousness claims sufficient to preclude summary judgment. Although Defendants have outlined numerous ways in which they argue one or more of the prior art references would render the Sightsound Patents obvious, those arguments are rebutted by Plaintiff. I mention only a few examples.

---

**26.** "Teaching away" describes a situation in which a person of ordinary skill who read the reference would be discouraged from following the reference, would be led in a direction different from that taken by the patentee, or would believe that the result of following the reference's disclosure would not be likely to produce the result sought by the patentee. Furthermore, if combining references would produce a seemingly inoperative device, they teach away from their combination. *Tec Air, Inc. v. Denso Mfg. Mich., Inc.,* 192 F.3d 1353, 1360–61 (Fed.Cir.1999) (internal quotations and citations omitted).

### a. *The Bowen Article:*

As Plaintiff's expert, Dr. Tygar, points out, the Bowen reference provides no indication of how dialing a series of numbers on a telephone in order to get a digital album via a telephone line into an "incoder" in the purchaser's home would actually be accomplished. (Tygar Rebuttal at 55.) He then lists six points which are not addressed in the Bowen Article and notes as well that nothing in this reference addresses in any way the electronic sales aspect of the Sightsound Patents. His conclusion is that because the Bowen Article not only fails to supply answers to the questions, but also fails to suggest any means by which the questions would be answered, nothing in this prior reference would make the Asserted Claims obvious. (*Id.* at 56.)

### b. *The Akashi Patent:*

As discussed above, this prior art reference incorporates no means for electronic sale of the desired digital signals, playback capacity, integrated speakers, or copy protection. There is also, at a minimum, a question of fact whether it teaches removable media or hard disk storage of the downloaded signals. (Plf.'s Brief in Opp. at 32.)

### c. *PAN:*

As Dr. Tygar points out, one skilled in the art would not be motivated to augment the PAN system with a means to prevent unauthorized reproduction of the downloaded signals because the purpose of PAN was to provide "access to a free and unrestrained exchange of information." (Tygar Rebuttal at 78.) When coupled with the fact that the PAN system provided only incidentally for the electronic sale of digital signals (as discussed above), PAN thus teaches away from the Hair invention. (Plf.'s Brief in Opp. at 22;32.)

### d. *Compusonics:*

Plaintiff points out that Dr. Moorer, one of Defendants' experts, admitted at his deposition that although developers of the Compusonics system "had the intent and desire to offer music in the form of digital audio for pay," the system did not incorporate certain elements that would make obvious the Asserted Claims regarding electronic sales using the control units of the buyer's and seller's computers. That is, Dr. Moorer admitted that the Compusonics system was not configured to accept credit card information and transmit it to the seller's mainframe as a preliminary step to downloading the signals. (Plf.'s Brief in Opp. at 23, *citing* Moorer Depo. at 146–149.) Moreover, the Compusonics system could be expected to teach away from integrating a means of copy protection since its entire purpose was to allow the consumer to edit the signals he received.

### e. *The IRD Reports:*

These reports, published by International Resource Development between 1982 and 1986, addressed such topics as downloading and teledelivery of music, video and software over telecommunications lines, generally on a pay-per-use basis. At least two IRD Reports, numbers 588 and 684, discuss the problem of illegal copying. (Defs.' Brief at 12–13.) Plaintiff's expert offers numerous reasons why none of the IRD Reports renders the Sightsound Patents obvious. (Tygar Rebuttal at 61–67.) For example, IRD 684 is silent regarding the fee aspect of downloading digital music files. While IRD 588 discusses the problem of illegal copying of music, there is no corresponding discussion of potential or actual solutions, and it concentrates on legal rather than technological means to prevent such copying. IRD 510 describes

a music service similar to current cable television services with some pre-programmed channels and others available on a pay-per-view basis, a system which is entirely inconsistent with the Hair invention. On the other hand, Dr. Tygar considered IRD 684 valuable because it reflects the perception among those skilled in the art that the companies which dominated the music distribution business in 1986 had no incentive to support teledelivery systems of digital music and were in fact actively refusing to cooperate with companies which attempted to do so. (Tygar Rebuttal at 62–63.) In his opinion, "IRD 684 makes it clear that one of ordinary skill in the art in 1986 would not be encouraged to develop music teledelivery systems and might very well be led away from that goal." (*Id.* at 63.)

### f. *The Freeny Patent:*

Charles Freeny, Jr., received a patent in July 1985 for a "System for Reproducing Information in Material Objects at a Point of Sale Location." (Hayes Decl. Exh. 22, U.S. Patent No. 4,528,643.) Briefly stated, the Freeny Patent describes a "point-of-sale kiosk" that delivers information on demand. A consumer selects the desired information from a catalog, enters a computer code, and, when the sale is approved, the part of the kiosk known as the information manufacturing machine ("IMM") copies the information onto a "material object," i.e., a portable medium which is delivered to the consumer. (Tygar Rebuttal at 73–76; Defs.' Brief at 10.) In Dr. Tygar's opinion, the Freeny Patent teaches away from the Hair invention, primarily because the device to which the information is downloaded is not the device on which the consumer plays back the recording, an element which is critical to the Asserted Claims of the Sightsound Patents. Dr. Tygar also concluded from the Freeny Patent that the "point of sale

kiosk" was located in a public place such as a store, where the consumer would not have "possession and control" over the device, as required by the Hair invention. (Tygar Rebuttal at 75–76.)

Defendants correctly point out that in *Interactive Gift Express, Inc. v. Compuserve, Inc.,* 256 F.3d 1323, 1334 (Fed.Cir. 2001), the Court construed "point of sale klosk" to include a location in a consumer's home, contrary to Dr. Tygar's conclusion that it was limited to a business location. However, the Court in *Interactive Gift Express* affirmed the lower court's construction of the term "material object" in the Freeny Patent to be (a) separate and distinct from the IMM, (b) removed from the IMM after purchase, and (c) intended for use away from the point-of-sale location. *Id.* at 1336. The Federal Circuit Court stated, "These three conditions . . . are fundamental to the meaning of a material object as clearly and consistently specified in the patent description." *Id.* at 1337. The Court explicitly noted that the "material object" on which the information is recorded "does not encompass the hard disk component of a home personal computer" and the material object "must be offered for sale, and be purchasable, at [the] point of sale location[ ]." *Id.* at 1338. Since one using the Hair invention purchases only the signals, not the material object on which they are stored, and since the Sightsound Patents specifically reference the consumer's system as incorporating a hard disk, the Freeny Patent, as construed by the Federal Circuit Court in *Interactive Gift Express,* arguably teaches away from the Hair invention in at least two ways. (*See,* e.g., Claims 13 and 14 of the '440 Patent as discussed in the Magistrate's Report at 65.)

### g. *The Hellman Patent:*

This patent was issued in April 1987 and describes a "software distribution system."

(Hayes Decl. Exh. 24, U.S. Patent No. 4,658,093, "the Hellman Patent.") The patent description concentrates on a mechanical means of preventing unauthorized copying. That is, the digital signal downloaded to the customer is never encrypted, per se; instead, the consumer must purchase a specially manufactured base unit which has a built-in decoder key. (Hellman Patent, col. 4, lines 37–63.) In order to playback the software, music or movie the consumer has purchased and downloaded, he initiates another contact to the seller who sends a signal to "unlock" the playback mechanism. In this sense, the Hellman Patent envisions a system more like "pay per view" television in that the copyright holder controls playback, not the consumer. (Defs.' Brief at 12.) As Dr. Tygar points out, the need for a special base unit (as compared to a personal computer) and the lack of control by the consumer both teach away from the Hair invention. (Tygar Rebuttal at 79.)

In sum, Dr. Tygar offers precise reasons why the prior art referenced by Defendants both fails to disclose the elements of the Sightsound Patents and fails to render the Asserted Claims obvious. Some prior art—for instance, the IRD Reports and the Hellman Patent—actually teach away from the Sightsound Patents and would thus discourage one skilled in the art in 1988 from attempting to develop a system or methodology comparable to the Hair invention.

There is another question to be considered, however, and that is whether one skilled in the art would be motivated to combine the teachings of Akashi, PAN, Compusonics and/or other prior art to arrive at the Hair invention. The Federal Circuit has stated:

> Evidence of a suggestion, teaching, or motivation to combine prior art references may flow, inter alia, from the references themselves, the knowledge of one of ordinary skill in the art, or from the nature of the problem to be solved. Although a reference need not expressly teach that the disclosure contained therein should be combined with another, the showing of combinability, in whatever form, must nevertheless be clear and particular.

*Winner Int'l,* 202 F.3d at 1348–49 (citations omitted).

As noted above, the purpose of the "motivation to combine" requirement is to prevent the use of hindsight based on the invention to defeat its patentability. "In other words, the [party opposing the patent] must show reasons that the skilled artisan, confronted with the same problems as the inventor and with no knowledge of the claimed invention, would select the elements from the cited prior art references for combination in the manner claimed." *In re Rouffet,* 149 F.3d 1350, 1357 (Fed.Cir.1998).

Dr. Tygar has offered his views as to why none of the prior art references, read in combination with other prior art, would render the Asserted Claims obvious. Moreover, he has put forth several arguments to support the conclusion that some prior art references actually teach away from certain Sightsound elements such as copy protection or a single unit to control all aspects of the consumer's use of the invention. (*See,* e.g., Tygar Rebuttal at 54–55 (Bowen Article); 64, 66, 67 (IRD Reports); 75–76 (Freeny Patent); 76–78 (Akashi Patent); 78(PAN); 78 (Compusonics); and 79 (Hellman).) These reasons are sufficiently cogent and well-reasoned that a factfinder could conclude the Sightsound Patents were not obvious.

█ Furthermore, I find that summary judgment must be denied because there are underlying unresolved questions of fact

with regard to evidence of secondary considerations of non-obviousness. Secondary considerations can "provide objective evidence of how the patented device is viewed in the marketplace, by those directly interested in the product." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1391 (Fed.Cir.1988). Secondary considerations include (1) long-felt but unsolved need; (2) commercial success of the invention; (3) failed efforts of others; (4) copying by others; (5) praise for the invention; (7) unexpected results; (8) disbelief of experts; (9) general skepticism of those in the art; (10) commercial acquiescence; and (11) simultaneous development. *See Nat'l Steel Car, Ltd. v. Canadian Pac. Ry. Co.*, 254 F.Supp.2d 527, 570 (E.D.Pa. 2003), and cases cited therein. "Evidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not. It is to be considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538–39 (Fed.Cir.1983). However, "there must be a nexus between the claimed invention and the secondary considerations before the evidence is relevant to the question of obviousness." *Nat'l Steel Car, id.*, citing *SIBIA Neurosciences*, 225 F.3d at 1358–59.

Plaintiff has presented evidence showing that not later than 1987, Compusonics had abandoned its efforts to commercialize the music downloading industry[27] and, in fact,

Dr. Tygar opined that none of the systems incorporating prior art survived as a consumer oriented mass market distribution system for digital music distribution. (Tygar Rebuttal at 80.) As he also noted, the IRD Reports reflected a general skepticism in 1986 for the viability of a teledelivery system for digital audio signals. At the same time, numerous articles dating from the 1990s show an ongoing interest in such services, establishing the fact that there was a long-felt need for the invention. (Plf.'s Exh. C, Rebuttal Report of Frederic R. Miller, "Miller Rebuttal," at 5.) We also know from the history of this case that while the '440 Patent application was still pending, Sightsound accused N2K of illegally copying technology covered by its earlier Patents.

On the other hand, Defendants essentially omit any discussion of secondary considerations from their Brief in Support of the Motion for Summary Judgment. In their Reply Brief, their argument on this point is limited to a conclusory statement: "Sightsound has not presented relevant evidence of secondary considerations because it failed to establish a nexus between the merits of the claimed invention and the evidence offered." (Defs.' Reply Brief at 6, *citing Cable Electric Prods., Inc., v. Genmark, Inc.*, 770 F.2d 1015, 1027 (Fed. Cir.1985);[28] *Sjolund v. Musland*, 847 F.2d 1573 (Fed.Cir.1988); *Windsurfing Int'l Inc., supra.*) I have reviewed the cited cases, despite not having a clear idea of how Defendants' single-sentence argument relates to them, and find that all three concentrate on commercial success, only

27. A former principal in Compusonics, David Schwartz, testified at his deposition that sometime in 1986 or 1987, his company "gave up on trying to commercialize" telerecording (which he defined as buying, selling and databasing music libraries for sale on demand.) (Plf.'s Exh. M, Deposition of David Schwartz, at 97.) He explained that record

companies in the United States, Europe and Japan "were not receptive to the concept in any way, shape, or form." (*Id.* at 142.)

28. Overruled on other grounds by *Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1358 (Fed.Cir.1999).

one of many secondary considerations which may be offered by a patentee. See *Cable Electric, id.* at 1027, holding that for commercial success to have "true relevance" to the question of nonobviousness, that success must be shown to be due to the nature of the patented subject matter, rather than to economic and commercial factors unrelated to the technical quality of the patented subject matter; *Sjolund, id.* at 1582, concluding that evidence of commercial success was irrelevant because the aspect of the invention to which its success was attributed was not part of the claimed invention. *Windsurfing Int'l,* which also discusses commercial success, focuses on the weight a district court may properly give to secondary considerations, concluding that the weight should correlate to the objective evidence provided to support them. 782 F.2d at 1000.

Here, I have noted Plaintiff's arguments that at the time the Sightsound Patents were issued, there were numerous examples of secondary considerations: copying, skepticism on the part of those skilled in the art as to the viability of such a system, long-felt but unsatisfied needs, and unsuccessful attempts by others to solve the problem underlying the claimed invention. Given nothing substantive from Defendants in their Reply Brief to refute these claims, I accept them as presented by Plaintiff for purposes of deciding this summary judgment motion.

### 5. *Conclusion:*

Conflicts in the evidence on factual issues are not to be resolved on summary judgment, particularly where those conflicts arise from competing expert opinions, the resolution of which is a matter reserved to the jury. *See Liberty Lobby,*

477 U.S. 242 at 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.") Here, numerous disputed questions of fact exist, not the least of which are the teachings of prior art references, what one skilled in the art in 1988 would be motivated to combine, and the weight to be given to secondary considerations. As a result, Defendants' Motion for Summary Judgment is denied with regard to its argument that the Sightsound Patents are invalid due to obviousness.

### D. *Did Plaintiff Calculate Its Alleged Damages Using a Method Invalid as a Matter of Law?*

Defendants argue that the methodology used by Sightsound for calculating its alleged damages against CDNow is invalid as a matter of law.[29] (Defs.' Motion at 1–2.) They seek partial summary judgment on the grounds that there is no factual or legal basis for calculating a "reasonable royalty" that includes a sixteen million dollar up-front royalty payment. (*Id.* at 2.)

The parties agree that Plaintiff's choice to calculate its damages from the alleged infringement is based on the acceptable theory of "reasonable royalty," one method by which compensatory damages may be measured. They further agree that a reasonable royalty is assumed to be that which would have resulted from a hypothetical negotiation between a willing patent owner and a willing potential user prior to the time the infringement began. (Defs.' Brief at 45; Plf.'s Brief in Opp. at 37); *see also SmithKline Diagnostics Inc.*

---

**29.** This argument does not apply to the alleged damages claimed against Defendant

N2K.

*v. Helena Laboratories Corp.*, 926 F.2d 1161, 1164 (Fed.Cir.1991); *Rite–Hite Corp. v. Kelley Co. Inc.*, 56 F.3d 1538, 1554 (Fed. Cir.1995). The parties take opposing positions, however, on whether an up-front royalty payment would have been included in the license agreement resulting from that hypothetical negotiation.

### 1. Relevant Law:

■ As a remedy for infringement, "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. The calculation of a reasonable royalty is an exercise in which the finder of fact "ascertains the results of a hypothetical negotiation between the patentee and the infringer at a time before the infringing activity began." *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 869 (Fed.Cir.2003). "The reasonable royalty calculus assesses the relevant market as it would have developed before and absent the infringing activity." Although an exercise in approximation, this analysis must be based on sound economic and

factual predicates. *Integra, id.* at 870 (internal quotation omitted).

■ The patent owner and the would-be licensee are presumed to be "reasonably and voluntarily trying to reach an agreement [in which] a prudent licensee— who desired, as a business proposition, to obtain a license . . .—would have been willing to pay . . . a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license." *Georgia–Pacific Corp. .v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y.1970), *modified and aff'd*, 446 F.2d 295 (2d Cir.), *cert. denied*, 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971).[30] In patent cases, "as in damage determinations in general, the measurement of actual damages is a question of fact." *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1578 (Fed. Cir.1992).

■ *2. Analysis:* Defendants argue that the $16 million up-front royalty payment is "inappropriate" as a matter of law because (1) it is predicated on the assumption that CDNow would have acquired N2K without benefit of a prior license between Sightsound and N2K for the

---

**30.** This, however, is only one of an extensive list of evidentiary facts to be considered in determining the amount of a reasonable royalty for a patent license. The other factors include: (1) royalties received for licensing of the patent in suit, proving or tending to prove an established royalty; (2) rates paid by the licensee for the use of other patents comparable to the patent in suit; (3) nature and scope of the license, e.g., exclusive or non-exclusive; (4) the patentee's established policy and marketing program to maintain his patent monopoly; (5) commercial relationship between the licensor and licensee; (6) effect of selling the patented specialty in promoting sales of other products of the licensee; (7) duration of the patent and the term of the license; (8) established profitability of the product, its

commercial success, and current popularity; (9) utility and advantages of the property over the old modes or devices, if any, which produced similar results; (10) nature of the patented invention, the character of the commercial embodiment of it, and benefits to its users; (11) the extent to which the infringer has made use of the invention; (12) the portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses; (13) the portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer; and (14) the opinion testimony of qualified experts. *Georgia Pacific*, 318 F.Supp. at 1120.

Sightsound Patents and (2) there is no factual or legal foundation for an award of an up-front payment in this case. (Defs.' Brief at 45.) Plaintiff counters that determining the structure of the hypothetical license between Sightsound and CDNow is a factual issue which "goes to the very heart of the reasonable royalty analysis." (Plf.'s Brief in Opp. at 37–39.)

As Plaintiff points out, Defendants offer no case law to support their position that the existence of an up-front royalty payment or its amount is a matter of law which may be determined by the court rather than a question of fact to be determined by the jury. (Plf.'s Brief in Opp. at 37–38.) The two cases on which Defendants rely in their Brief are readily distinguishable. First, *Tec Air v. Nippondenso Mfg. U.S.A.*, 91 C 4488, 1996 WL 556739, 1996 U.S. Dist. LEXIS 14292 (N.D. Ill. Sept. 27, 1996) is a case in which the court considered, *inter alia*, the argument the plaintiff should not be able to claim a reasonable royalty of 10%. *Id.* 1996 WL 556739, at *7, 1996 U.S.Dist. LEXIS 14292, at *20. The court denied the motion for summary judgment, concluding that it would be "premature" to deny Tec Air the royalty it sought because it had provided an expert witness report, evidence of its relevant past marketing practices, and evidence of royalty rates charged to other companies. *Id.* 1996 WL 556739, at *7, 1996 U.S.Dist. LEXIS 14292, at *23–24. In *Minco Inc. v. Combustion Eng'g*, 95 F.3d 1109, 1118 (Fed. Cir.1996), the appeals court reviewed the lower court's decision to use both lost profits and a reasonable royalty to ascertain damages. The district court's analysis had been based on facts submitted at trial, not at summary judgment. *Id.* I have not found any case which supports Defendants' position that a court may exclude, as a matter of law, a specific line-item entry or a monetary amount proposed by a claim-

ant as part of its damages calculation at the summary judgment stage.

Both parties offer hypothetical scenarios of what they would or would not have done in 1999 when Defendants launched cdnow.com. (Plf.'s Brief in Opp. at 39–45; Defs.' Brief at 46–50.) At trial, assuming infringement has been found, Sightsound will bear the burden of proving its damages based on "sound economic and factual predicates," not pure speculation. *Smith-Kline Diagnostics*, 926 F.2d at 1164; *Integra Lifesciences*, 331 F.3d at 870. To counter Plaintiff's evidence, Defendants will also present their version of the hypothetical negotiation. Plaintiff has come forward with an expert's report explaining why Sightsound would have been motivated to require an up-front payment from CDNow and why that amount could reasonably be calculated as $16 million. (Plf.'s Brief in Opp. at 40–41; *see also* Plf.'s Exh. B, Report of Frederic R. Miller, at 12–14.) The jury may not agree with Dr. Miller's inclusion of an up-front license fee or the amount, but that is its decision to make, not the decision of this Court.

Defendants assert that there is no basis in the law for an up-front payment in any amount, and that such payments are usually made only where the license involved a "significant extra element in addition to the bare patent (such as trade secrets or substantial research and development costs) or licensor's past practices established a clear policy of requiring up-front payments." (Defs.' Brief at 49.) As the Federal Circuit Court has pointed out, nothing in the language of 35 U.S.C. § 284 "precludes a jury from including ... an additional amount for an up-front licensing fee or to elevate the damage award above the baseline of a reasonable royalty, so as to compensate [the plaintiff] adequately for [the defendants'] infringement" as long as "reasonable jurors, viewing the evidence as

a whole, could have found the facts needed to support the verdict in light of the applicable law." *Bradford Co. v. Jefferson Smurfit Corp.*, 00–1511, 00–1546, 2001 U.S.App. LEXIS 25205, *13–*14 (Fed.Cir. Oct. 30, 2001). Reiterating the point made above that the amount of a reasonable royalty is a question for the jury, the district court in *LinkCo, Inc. v. Fujitsu Ltd.*, 232 F.Supp.2d 182, 188 (S.D.N.Y. 2002), noted that where the parties disagree on whether lump-sum license fees should be included in the calculation, "a reasonable royalty may be computed in various ways, including a lump-sum royalty based on expected sales or a running royalty based on a percentage of actual sales.... A jury may award damages based on a lump-sum if there is sufficient evidence that lump-sum license structures are common in the industry."

### 3. Conclusion:

I find that there are genuine issues of material fact surrounding the hypothetical license negotiation between Plaintiff and CDNow. Like the Court in *Tec Air*, I believe it is premature to deny Plaintiff the opportunity of presenting to the jury evidence to support its claim that the resulting agreement would have included an upfront royalty of 16%. Defendants' Motion for Summary Judgment seeking to find Plaintiff's damages methodology invalid as a matter of law is therefore denied.

## IV. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Sightsound moves to dismiss with prejudice Defendants' counterclaim and affirmative defenses based on inequitable conduct in prosecution of the '440 Patent. Having concluded that Defendants have failed to come forth with evidence on a question on which they will carry the burden at trial, I will grant Plaintiff's Motion.

### A. Facts Relevant to Plaintiff's Motion for Summary Judgment

Construing the facts in favor of Defendants as the parties opposing the Motion for Summary Judgment, the record is clear that Mr. Hair experienced a great deal of difficulty with the PTO in acquiring the '440 Patent. Mr. Hair filed the initial application for the third of his patents on June 6, 1995, claiming priority back to June 13, 1988, when he had applied for '573 Patent. (Defendants' Opposition to Sightsound's Motion for Summary Judgment, "Defs.' Opp.," Docket No. 177, at 3–4.) The PTO examiner initially rejected all 63 claims of the '440 Patent on the basis of obviousness. (*Id.* at 4.) Following an interview between the PTO and Mr. Hair and his patent counsel, Ansel Schwartz, in May 1996, Mr. Schwartz filed a number of amendments to the specifications and claims, added new claims, and set out his reasons why the patent should be granted. In October 1996, the patent application was rejected a second time for obviousness.

Undeterred, Mr. Schwartz submitted another response on April 14, 1997, attempting to distinguish the Freeny Patent which had been the primary basis of the examiner's second rejection. (Defs.' Opp. at 4.) In July 1997, the examiner again rejected the application, this time indicating that her decision was final. In response, Mr. Schwartz filed an appeal, raising for the first time an argument that secondary considerations of commercial success and copying by others showed that Mr. Hair's invention was not obvious. Specifically, Mr. Schwartz described an agreement between Parsec Sight/Sound, Inc., and Digital Sight/Sound, Inc. (the two predecessors of Plaintiff), and the fact that Digital Sight/Sound had raised over $1 million to implement the claimed invention, asserting

that a "material license arrangement has been formed." He also referred to evidence of copying by various parties, including N2K. Mr. Hair personally signed a declaration supporting these arguments by his counsel. (*Id.* at 5.)

Again, the examiner rejected the application, but this time provided a "road map" for Mr. Hair and his counsel to follow in attempting one more time to persuade the PTO to issue the patent. The examiner pointed out that Mr. Schwartz had failed to establish a nexus between the invention itself and the commercial success that was claimed. Defendants contend that Mr. Schwartz "obliged" the examiner by offering evidence of commercial success in the form of misrepresentations concerning a "license arrangement" between AT & T and Parsec. (Defs.' Opp. at 14.)

This time, the appeal was successful. The patent examiner withdrew her rejection of the claims and issued a Notice of Allowability on September 15, 1998. (Defs.' Opp. at 7.) Eventually, the '440 Patent was issued on October 13, 1999. Although Mr. Schwartz filed additional documentation between September 1998 and October 1999, he never disclosed to the PTO that the AT & T/Parsec "license arrangement" failed to evolve into a written agreement. (*Id.*)

When Sightsound sued first N2K and then CDNow and CDNowOnline, Defendants raised the affirmative defense and counterclaim that Plaintiff had breached its duty of candor, good faith and honesty in prosecuting the '440 Patent before the PTO. (*See* N2K's Sec. Am. Ans., Docket No. 80, Exh. A, and CDNow's Am. Ans., Docket No. 78, Exh. 1.) Succinctly stated, Defendants claim that the '440 Patent was obtained as a result of inequitable conduct because (1) Sightsound represented to the PTO that it had formed a "license *arrangement*" with AT & T with the intent to mislead the examiner into believing that an actual license *agreement* had been formed; and (2) Sightsound failed to inform the PTO that AT & T and Parsec never consummated an actual license agreement. (Defs.' Opp. at 1.) Because the AT & T/Parsec "license arrangement" was the only new evidence of commercial success submitted by Mr. Schwartz with his Appeal Brief, it is indisputable this information was material to the examiner's determination that the '440 Patent was not obvious since she subsequently withdrew her objections and allowed the patent to issue. (*Id.*) Defendants contend that because of this inequitable conduct, the '440 Patent should be declared invalid.

## B. *Relevant Law*

Applicants for patents and their representatives[31] are required to prosecute applications in the PTO with candor, good faith, and honesty. *Molins PLC v. Textron*, 48 F.3d 1172, 1178 (Fed.Cir.1995), citing *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 818, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). A breach of this duty constitutes inequitable conduct. *Molins, Id.*

As the Federal Circuit Court of Appeals has recently summarized:

---

**31.** Pursuant to 37 C.F.R. § 1.56, as it pertains to the facts of this case, these duties apply to the inventor, to an attorney who prosecutes a patent application on behalf of the inventor, and to any assignee of the inventor. *See Molins*, 48 F.3d at 1178, n. 6. Because Defendants focus on the actions of Mr. Schwartz, the attorney prosecuting the application for the '440 Patent, and do not discuss any other allegedly inequitable actions taken by Mr. Hair and/or Parsec (the assignee of the '440 Patent), I will refer only to Mr. Schwartz herein, recognizing that his actions are attributable to Mr. Hair. *See FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 n. 8 (Fed.Cir. 1987).

Inequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive. Determination of inequitable conduct requires a two-step analysis. First, the trial court must determine whether the conduct meets a threshold level of materiality. The trial court must then also determine whether the evidence shows a threshold level of intent to mislead the PTO.... Once the threshold levels of materiality and intent have been established, the trial court is required to weigh them. In light of all the circumstances, the court must then determine whether the applicant's conduct is so culpable that the patent should be held unenforceable.

*Bd. of Educ. ex rel. Bd. of Tr. of FSU v. Am. Bioscience, Inc.*, 333 F.3d 1330, 1343 (Fed.Cir.2003) (internal citations omitted.)

 Inequitable conduct is a question of equity to be decided by the court. *Paragon Podiatry Lab. v. KLM Labs.*, 984 F.2d 1182, 1190 (Fed.Cir.1993). A party alleging inequitable conduct as a defense must prove the threshold elements of materiality and intent by clear and convincing evidence. *Abbott Labs v. Torpharm. Inc.*, 300 F.3d 1367, 1380 (Fed.Cir.2002). While generally, "precedent urges caution in the grant of summary judgment respecting a defense of inequitable conduct, summary judgment is not foreclosed." *Paragon Podiatry*, 984 F.2d at 1190. "[A] motion for summary judgment may be granted when, drawing all reasonable factual inferences in favor of the non-movant, the evidence is such that the non-movant can not prevail." *Abbott Labs, id.* at 1379, *citing ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 547 (Fed.Cir. 1998).

### C. *Defendants' Claims of Inequitable Conduct*

Defendants' claims of inequitable conduct are based on an alleged misrepresentation made to the PTO in the appeal of the final rejection and on Plaintiff's purported failure to cure that misrepresentation. When Mr. Schwartz filed his Appeal Brief in response to the PTO examiner's rejection, he wrote in relevant part:

Appellant submits herewith a Declaration by inventor Arthur R. Hair which introduces secondary evidence of patentability of the claimed invention.... The secondary evidence introduced into the record is that of copying, and commercial success. In regard to commercial success, Digital Sight/Sound, Inc. has licensed the claimed invention ... and has raised over $1,000,000.00 to implement the claimed invention. This investment of $1,000,000.00 evidences the claimed invention is unique and different from anything before. This investment supports the fact a material license arrangement has been formed. Such secondary evidence of licensing supports patentability of the claimed invention....

In addition, since the Notice of Appeal was filed, the real party in interest has formed a license arrangement with AT & T to license the claimed invention of appellant. A copy of the letter by AT & T to the real party in interest, Parsec Sight/Sound, Inc., is enclosed.

The Declaration also introduces into the record evidence of copying by N2K and by various parties having web sites who have been sued by the major record labels. Copying, especially by N2K which is a publicly traded company on the Nasdaq Stock Exchange ... is strong evidence of patentability.... This is because N2K who had ample resources, copied the claimed invention

rather than any prior art device that it could have, thus strongly evidencing nonobvious [sic].

(Exhibits to Sightsound's Brief in Support of its Motion for Summary Judgment Dismissing Defendants' Inequitable Conduct Defenses and Counterclaims, "Plf.'s Sum. Judg. Exhs.," Docket No. 158, Exh. 1, Appeal Brief Dated June 9, 1998, "Appeal Brief," at 63–65.)

The letter referred to in the second paragraph of the excerpt from the Appeal Brief quoted above is from Albert B. Chu, Vice President for Market Development of AT & T Labs. (Plf.'s Sum. Judg. Exh. 2, "the Chu Letter.") It is dated April 27, 1998, and addressed to Scott Sander, then the CEO and President of Digital Sight/Sound Inc. and Parsec Sight/Sound, Inc. In relevant part, the letter reads:

> We appreciate your understanding of AT & T's internal procedures. Given that a2b music [32] is to be formed as a separate and distinct venture outside of AT & T, it will be more efficient to have a2b music sign the license directly with Parsec Sight/Sound Inc. after the legal entity is formed. The following summarizes the plan that we have agreed to:
>
> 1. [Digital Sight/Sound Inc.] will sign a license with AT & T for the a2b music platform (attachment 1) which will be assigned to a2b music when the new a2b music legal entity is formed, which is anticipated to be within 60 days.
>
> 2. . . . .

> 3. a2b music will sign the [Parsec Sight/Sound Inc.] Patent License (attachment 2) within 10 business days after it is formed as a legal entity. The license will be retroactive to the date that 1 above is signed and any royalties due under the agreement shall be remitted per the terms of the agreement. . . .
>
> 4. . . . .
>
> 5. It is understood that the name of the new entity may not be a2b music, and that it is also possible that the assets of a2b music may be sold to a third party. Either case will remain subject to these agreements. Further, in the event that a2b music is not formed as a separate entity and is retained by AT & T, AT & T shall have the option of taking the license on behalf of the a2b music "division."

(Chu Letter.)

AT & T's strategy during the period of negotiations preceding this letter was to have a small division, "a2b music," sign up a major record label as the first step in creating market conditions which would allow the spin-off of the division into a separate subsidiary. (Plf.'s Sum. Judg. Exh. 4, Deposition of Christopher J. Reese,[33] "Reese Depo.," at 43–44; Exh. 5, Deposition of John E. Rudder, Jr.,[34] "Rudder Depo.," at 25–26.) When the Chu Letter was written in the Spring of 1998, AT & T and Plaintiff's predecessors had tentatively agreed to become cross-licensees of each other's technology, i.e., AT & T would license the technology encom-

---

32. The "a2b music" platform had been developed in approximately 1997 by AT & T as technology for playing downloaded digital music. AT & T was interested in licensing this technology to Sightsound. (Plf.'s Sum. Judg. Exh. 5, Deposition of John E. Rudder, Jr., at 79–80.)

33. Mr. Reese was Executive Vice President and General Counsel of Sightsound. (Docket No. 175, Plf.'s Exh. 1, Reese Depo. at 7–8.)

34. Mr. Rudder was Director of New Market Development for AT & T. He was involved in the negotiations leading up to the Chu Letter and actually drafted the letter for Mr. Chu's signature. (Rudder Depo. at 25, 104, 90.)

passed in the Sightsound Patents and Sightsound would license certain software related to the a2b music platform. (Rudder Depo. at 26, 121–122.) Sometime in late 1998 or early 1999, AT & T made a strategic business decision not to spin-off a2b music, and communications with regard to the license "just fizzled out." (Reese Depo. at 44; Rudder Depo. at 126–127.) No written licensing agreement between the parties under which AT & T or a2b music would license the technology encompassed in the Sightsound Patents was ever signed. (Reese Depo. at 105; Rudder Depo. at 123.) But, according to Mr. Rudder, "if AT & T were to decide that they wanted to go ahead and execute the license, they could, and I think it would be our prerogative to do so" under the terms of the Chu Letter. (Rudder Depo. at 136.)

## D. *Analysis*

Plaintiff claims that it is entitled to summary judgment on the counterclaim and defenses of inequitable conduct because no affirmative misrepresentation of a material fact occurred in the prosecution of the '440 Patent. (Plaintiff's Brief in Support of its Motion for Summary Judgment, "Plf.'s Sum. Judg. Brief," Docket No. 157, at 10–14.) If there were no misrepresentation, Defendants cannot possibly satisfy the second prong of an inequitable conduct *prima facie* case, that is, establishing that the misrepresentation was made with the intent to deceive the PTO. (*Id.* at 15.) Moreover, Mr. Schwartz' lack of intent to deceive is evidenced by the fact that he provided to the PTO a copy of the Chu Letter, the content of which is accurately summarized in his Appeal Brief. (*Id.* at 15–16.)

Defendants concentrate on the question of whether the assertions regarding the license arrangement were material to the PTO examiner's decision to withdraw her rejection of the '440 Patent application. (Defs.' Opp. at 13–14.) Accepting for the sake of analysis that they are correct on this point and the statements persuaded the examiner to allow the patent to issue, I still find that Defendants have failed to come forward with any evidence to support their allegations that Mr. Schwartz intended to mislead the PTO regarding the license arrangement with AT & T. Because the latter point is dispositive of the motion for summary judgment, I need not address the materiality issue and will turn directly to Defendants' arguments concerning the second prong of a *prima facie* case of inequitable conduct, intent to deceive the PTO.

### 1. *Deceptive Use of the Phrase "Licensing Arrangement ... to License:"*

For purposes of an inequitable conduct defense, "intent" means the "design, resolve, or determination with which a person acts; a state of mind in which a person seeks to accomplish a given result through a course of action." *Molins,* 48 F.3d at 1180. In addressing the question of intent, a court must consider whether "the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith," reflects "sufficient culpability to require a finding of intent to deceive." *Kingsdown Medical Consultants Ltd. v. Hollister, Inc.,* 863 F.2d 867, 876 (Fed.Cir. 1988), *en banc.* That does not mean that the party alleging inequitable conduct must come forward with "smoking gun" evidence. *Merck & Co. v. Danbury Pharmacal, Inc.,* 873 F.2d 1418, 1422 (Fed.Cir. 1989) ("Intent need not, and rarely can, be proven by direct evidence."). Rather, intent to deceive may be inferred from the facts and circumstances surrounding the applicant's overall conduct. *Id.* (Intent "is most often proven by a showing of acts the

natural consequences of which are presumably intended by the actor.")

Defendants first argue that intent to deceive can be inferred from Mr. Schwartz' statement that Sightsound's predecessor "has formed a license arrangement with AT & T to license the claimed invention." (Defs.' Opp. at 15.) Based on the language of Mr. Schwartz' Appeal Brief, I find that his use of the phrase "to license" and the word "arrangement," in the context presented, accurately reflect the statements made in the Chu Letter. Even if the PTO examiner may not have received or reviewed the Chu Letter (see discussion below), Mr. Schwartz' representation would be an accurate synopsis of the content of that letter. The Chu Letter uses the phrase "the plan that we have agreed to" which can reasonably be described as an "arrangement," defined as "disposition of measures for the accomplishment of a purpose; preparations for successful performance." OED online. According to the Chu Letter and as accurately reflected in Mr. Schwartz' Appeal Brief, Parsec and AT & T "had" (past tense) arrived at an "arrangement" (i.e., a plan) under which a2b music or AT & T agreed "to license" (at some unspecified time in the future) Mr. Hair's invention (under the circumstances outlined in steps 1 through 5 of the letter).

Moreover, since Mr. Schwartz' phrase "formed a license arrangement ... to license" accurately reflected the state of affairs between AT & T and Parsec at the time the Appeal Brief was submitted to the PTO, Defendants' argument that Mr. Schwartz knew when he submitted the Appeal Brief that no license had been executed is irrelevant for proving intent to deceive at that time. (See Defs.' Opp. at 15.) Even if he knew on June 9, 1998, that no license agreement had yet been signed, that does not reflect an intent to deceive

with regard to something that had already happened in the past, i.e., formulation of the parties' plan to enter into reciprocal license agreements, especially because the clock was still running on the 60–day period they had anticipated for creating a2b music as a separate entity.

### 2. Inconsistent and Deceptive Use of the Phrase "License Arrangement:"

Defendants next argue that intent to deceive can be inferred from the use of the same phrase, "license arrangement," to describe an already established legal agreement between Digital Sight/Sound and Parsec Sight/Sound and to describe a tentative plan between AT & T and Parsec. (Defs.' Opp. at 16.) They contend that "any suggestion that there is any real distinction between the phrase 'a license arrangement has been formed' on the one hand, and 'has formed a license arrangement to license' on the other, is nothing short of absurd." (Id.)

This absurdity arises only if the two phrases are taken completely out of context as Defendants have done. The complete discussion of the license between Digital and Parsec makes it clear that this "arrangement" was a *fait accompli*. Mr. Schwartz wrote "Digital *has* licensed" and Mr. Hair's Declaration submitted in support of that statement also uses the phrase "*has* licensed" and provides a copy of the executed agreement dated October 1, 1997. (Joint Exhibits re: Claim Construction Briefs, Vol. 3, Patent File History for U.S. Patent 5,966,440, "Claim Const. Jt. Exhs.," Docket No. 72, Exh. 19 at 2, emphasis added.) A patent examiner presented with the exhibits to Mr. Schwartz' Appeal Brief would understand that the reference to a "license arrangement" in the context of the paragraph describing the Parsec/Digital relationship was to an executed

agreement while the same phrase in the paragraph describing the AT & T/Parsec relationship reflected a plan to enter into a license agreement. While in hindsight Mr. Schwartz could have chosen to more accurately describe the Parsec/Digital relationship as "an agreement" rather than "an arrangement," his use of the same term to describe an already executed agreement as opposed to a tentative agreement hardly rises to the level of clear and convincing evidence of an intent to deceive.

### 3. Misrepresentations Made to the Public.

Defendants next refer to two press releases and two memoranda dating from May through September 1998 which state or at least imply that AT & T or a2b music had entered into a formal licensing agreement with Sightsound. (Defs.' Opp. at 16; see also Exhibits to Defendants' Brief in Opposition to Sightsound's Motion for Summary Judgment, Docket No. 178, Deposition of Scott Sander, Exhs. 16, 17, 18, and 24.) Defendants concede that these documents were not provided to the PTO but argue that they may be used as circumstantial evidence regarding Sightsound's intent to deceive. (Defs.' Opp. at 17.) As far as the record shows, these documents were neither prepared nor approved by Mr. Schwartz. Defendants do not provide, and independent research by the Court has failed to discover, case law which supports a conclusion that documents not presented to the PTO which are inconsistent with statements made before the PTO can be evidence of an intent to deceive.

### 4. Issues of Fact Concerning the Chu Letter at the PTO:

Finally, Defendants argue that there are questions of fact surrounding the Chu Letter which require me to deny summary judgment. (Defs.' Opp. at 17.) First, they argue that it is an undisputed fact that the Chu Letter does not appear in the official file history immediately following Mr. Schwartz' Appeal Brief, but rather with documents he prepared and submitted on June 19, 1998, as part of an Information Disclosure Statement ("IDS.") (See Claim Const. Jt. Exh. 23.) They contend that the Manual of Patent Examining Procedure ("MPEP") [35] requires an Information Disclosure Statement submitted during patent prosecution to identify and concisely explain the relevance of all information submitted. The IDS does not refer to the Chu Letter in any way. Defendants appear to infer that the location of the Chu Letter in the PTO's file immediately after the IDS is evidence (1) that it was not submitted with the Appeal Brief and (2) that Mr. Schwartz was attempting to defraud the PTO by "slipping" the Chu Letter into the record without listing it in the IDS. They further argue that although the file indicates the examiner reviewed the other documents submitted with the IDS, nothing on the list of documents submitted therewith shows that she considered the Chu Letter. Even if she reviewed the Chu Letter with the IDS, that is, weeks after the Appeal Brief was submitted, they argue, "given her interim workload, it is far from certain that she would have related it to the statement made in the Brief on Appeal." (Defs.' Opp. at 17–18 and n. 13.)

35. "Although it does not have the force of law, [the MPEP] is well known to those registered to practice in the PTO and reflects the presumptions under which the PTO operates." Critikon, Inc. v. Becton Dickinson Vascular Access, 120 F.3d 1253, 1257 (Fed.Cir. 1997). The MPEP is entitled to judicial notice under Federal Rule of Evidence 201, since it is an official interpretation of an agency's statutes and regulations. See Litton Systems Inc. v. Whirlpool, 728 F.2d 1423, 1439 (Fed.Cir.1984).

While interesting, this argument is pure speculation. As Defendants point out, there is a heightened duty of disclosure applicable where factual representations are made which cannot be independently verified by the PTO. (Defs.' Opp. at 18, n. 14.) Mr. Schwartz' good faith intent to submit the Chu Letter with the Appeal Brief to support the representations about the AT & T/Parsec license arrangement is clear from his statement therein. *See Kingsdown Medical Consultants,* 863 F.2d at 876; *Gambro Lundia AB v. Baxter Healthcare Corp.,* 110 F.3d 1573, 1580 (Fed.Cir.1997) (when examining intent to deceive, a court must weigh all the evidence, including evidence of good faith.) There is no evidence to show that the Chu Letter was not submitted with the Appeal Brief. The fact that it appears out of order in a file Mr. Schwartz did not manage reflects nothing about his state of mind.[36] The fact that the PTO examiner has not initialed the IDS form to indicate she reviewed the Chu Letter logically follows from the fact that the Chu Letter is not listed on that form.

"An inference can and often must be drawn from established facts and direct proof of wrongful intent is not required, but drawing an inference on an inference on an inference is not the role of the fact finder.... [T]he statement that 'a determination of inequitable conduct may not be based on inferences' is absolutely accurate." *FMC Corp. v. Manitowoc Co.,* 835 F.2d 1411, 1417 and n. 11 (Fed.Cir.1987). Here, Defendants rely on a single fact—the fact that the Chu Letter is out of order in the PTO file—to infer that (1) Mr. Schwartz knew the Chu Letter was not consistent with the statement he made about the AT & T/Parsec licensing arrangement in his Appeal Brief; (2) he failed to submit the letter with his Appeal Brief so that this inconsistency would not come to the PTO examiner's attention; (3) he did so with the intent to deceive the PTO; (4) he later submitted the Chu Letter surreptitiously with the IDS in order to get it into the record without drawing attention to it; (5) the PTO examiner did not review the Chu Letter; and (6) even if she did review the letter, she did so out of context and could not have related it to the statement in the Appeal Brief. This string of inference-upon-inference creates no more than the air of "metaphysical doubt" against which the Supreme Court has cautioned. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In the alternative, Defendants argue that the PTO examiner, reading the Chu Letter in light of the representations in the Appeal Brief, could have reasonably concluded that the AT & T license had already been executed. Their reasoning here is that (1) the Chu Letter clearly states that any spin-off of a2b music is anticipated to occur within 60 days; (2) the Appeal Brief was submitted on June 11, 1998, 46 days later; (3) absent a further disclosure in the Appeal Brief that the anticipated license had not been executed, the PTO examiner could have concluded that a2b music had been formed as a separate entity and that the license agreement had been executed. (Defs.' Opp. at 18.) Defendants fail to explain why a reasonable examiner would conclude that something which was *anticipated* to occur within 60 days *had* occurred within 46 days

---

**36.** The ease with which documents can be misfiled is evidenced by the fact that Volume 3 of the Claim Construction Joint Exhibits was presented to the Court with Exhibits 24 through 30 attached upside down and in reverse numeric order. I draw no conclusions about the state of mind of the attorneys who prepared the Joint Exhibits except perhaps their utter fatigue from having to manage so much paper.

simply because Mr. Schwartz failed to state that it had *not occurred.* Nor do they explain how intent to deceive can be inferred from such a failure. *See Fuji Photo Film Co. v. Jazz Photo Corp.,* 173 F.Supp.2d 268, 276 (D.N.J.2001) ("drawing a string of inferences of misconduct based on inaction, when such inaction might equally be benignly intended, can not constitute clear and convincing evidence of intentional[ly] withholding" material information from the PTO.) I find this argument nothing more than metaphysical doubt about what might have occurred in the mind of the PTO examiner, not what was occurring in the mind relevant to this question, that of Mr. Schwartz.

### 5. *Failure to Comply with the Continuing Duty to Disclose Material Information to the PTO:*

Finally, Defendants argue that Sightsound had a continuing duty to disclose material information to the PTO pursuant to Section 2001.06 of the MPEP. They contend that AT & T's concerns during negotiations leading up to Chu Letter, specifically the company's doubts as to the validity of the Patents, should have been disclosed.[37] (Defs.' Opp. at 19.) They argue that Sightsound further breached its duty of candor by failing to disclose the fact that after a draft license agreement was forwarded to AT & T, there were no further substantive negotiations, and by failing to inform the examiner that a2b music was never formed as separate entity. In sum, Sightsound knew before the '440 Patent was issued on October 12, 1999, that the AT & T "deal was dead" and its failure to apprise the PTO of this fact breached its continuing duty to disclose material information of which the applicant

is aware at any time during prosecution of a patent. (*Id.* at 19–20.)

A continuing duty of disclosure during the period preceding issuance of the patent has been expressly recognized by the Federal Circuit. *See Brasseler U.S.A. I.L.P. v. Stryker Sales Corp.,* 93 F.Supp.2d 1255, 1264 (Fed.Cir.1999). Section 2001.06 of the MPEP begins with the general statement that "all individuals covered by 37 C.F.R. 1.56 ... have a duty to disclose to the Patent and Trademark Office all material information they are *aware* of regardless of the source of or how they become aware of the information.... If material, the information must be disclosed to the Office. The duty to disclose material information extends to information such individuals are aware of prior to or at the time of filing the application or become aware of during the prosecution thereof." MPEP § 2001.06, Sources of Information (2003) (emphasis in original). The Manual then sets out three specific types of information which should be disclosed: "any material prior art or other information cited or brought to their attention in any related foreign application;" "information within [the individual's] knowledge as to other copending United States applications which are 'material to patentability' of the application in question;" and material information arising from litigation relating to the subject matter of a pending patent application, including "any assertion that is made during litigation which is contradictory to assertions made to the examiner" and "defenses raised against validity of the patent, or charges of fraud or inequitable conduct in the litigation." *See* MPEP § 2001.06(a), (b) and (c), respectively. I find no explicit duty to provide the types of information Defendants assert should have

---

**37.** Defendants offer no analysis of or legal support for this conclusory statement and it is

not discussed further herein.

been disclosed to the PTO.[38] Therefore, breach of this duty of continuing disclosure could only occur if that information falls under the general rubric of information material to the application.

Again, assuming for the sake of argument that some or all of the information Defendants contend should have been disclosed was material, there is still no evidence that any one associated with prosecution of the '440 Patent acted with intent to deceive by not providing it to the PTO. The conduct allegedly giving rise to a breach of an applicant's duty of disclosure, like other acts considered in inequitable conduct analyses,

> must not amount merely to the improper performance of, or omission of, an act one ought to have performed. Rather, clear and convincing evidence must prove that an applicant had the specific intent to accomplish an act that the applicant ought not to have performed, *viz.*, misleading or deceiving the PTO. In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant made a deliberate decision to withhold a known material [fact.]

*Molins*, 48 F.3d at 1181.

As Plaintiff points out, Defendants' argument in this regard is unsupported by the record. (Plaintiff's Reply Brief, Docket No. 183, at 7.) Mr. Reese, a representative of Plaintiff, and Mr. Rudder, a representative of AT & T, still believed, as of their depositions in 2000–2001 that if AT & T wanted to act on the Chu Letter, it could. The failure to advise the PTO that

a2b music was never formed as a separate entity cannot be viewed as a material omission because the Chu Letter anticipated an alternative route in such an event, i.e., that AT & T itself could act. Nor is there any evidence that anyone associated with prosecution of the '440 Patent made a "deliberate decision" to withhold information about the status of the AT & T / Parsec agreement from the PTO even if a "reality check" would have indicated it was unlikely the agreement would ever materialize. Given the total lack of evidence of his intent to mislead or deceive the PTO, I conclude that the failure to provide such information was, at most, omission by Mr. Schwartz of an act he arguably should have performed.

As stated above, the third step in an inequitable conduct analysis is for the court to balance the materiality of the conduct against the intent of the actor. However, where the party asserting inequitable conduct has failed to establish a threshold showing of either materiality or intent, there is no need for the court to proceed to the balancing stage. *Union Oil Co. v. Atlantic Richfield Co.*, 34 F.Supp.2d 1208, 1217 (C.D.Cal.1998); *Ajinomoto Co. v. Archer–Daniels–Midland Co.*, CA No. 95–218–SLR, 1998 WL 1515411, *46, 1998 U.S. Dist. LEXIS 3833, *152 (D.Del. Mar. 13, 1998). Accordingly, Plaintiff's Motion for Summary Judgment on Defendants' counterclaims and affirmative defenses that the '440 Patent is unenforceable due to inequitable conduct before the PTO is granted.

---

**38.** Although Sightsound filed suit against N2K on January 16, 1998, that suit addressed only the '573 and '734 Patents and the defenses raised by N2K in its Answer (Docket No. 6) were only unspecified claims of invalidity under 35 U.S.C. §§ 102, 103 and 112. Plaintiff did not amend its complaint to include infringement of all three Patents until April 3, 2000, well after the '440 Patent had issued. The inequitable conduct counterclaim was not raised until N2K filed its First Amended Answer and Affirmative Defenses and Counterclaims (Docket No. 45) on May 18, 2000.

### E. N2K's *Affirmative Defense re: Failure to Disclose Prior Art*

In its Fourth Affirmative Defense, N2K alleges that in early 1993, Sightsound paid a third party to conduct a review of prior art material to the applications for the '573 and '734 Patents, but failed to disclose the results of that research to the PTO. (N2K's Sec. Am. Ans., ¶¶ 40–43.) Although this matter was raised in Plaintiff's Motion for Summary Judgment (at 9, 16–17), Defendants' Brief in Opposition fails to address this point, even in passing. Summary judgment is therefore granted in favor of Sightsound on the Fourth Affirmative Defense of inequitable conduct raised by Defendant N2K.

### ORDER OF COURT

And now, this 23rd day of October, 2003, after careful consideration and for the reasons set forth in the Opinion accompanying this Order, it is ordered that the Motion for Summary Judgment by Defendants N2K, Inc., CDNow, Inc., and CDNowOnline, Inc. (Docket No. 159), is denied.

It is further ordered that Plaintiff's Motion for Summary Judgment (Docket No. 156) is granted in its entirety and that all affirmative defenses and counterclaims relating to inequitable conduct raised by N2K, Inc., CDNow, Inc., and CDNowOnline, Inc., are dismissed with prejudice.

A Pre–Trial/Settlement Conference will be held on Wednesday, November 12, 2003 at 10:00 A.M. before the undersigned. Counsel must have settlement authority and parties shall be in person or available by telephone.